UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

TERRY DALE TILMON                      CIVIL ACTION NO. 21-4037

                                       SECTION P

VS.

                                       JUDGE TERRY A. DOUGHTY

CHAIRMAN OF THE UNION                  MAG. JUDGE KAYLA D. MCCLUSKY
PARISH DETENTION CENTER
COMMISSION, ET AL.

REPORT AND RECOMMENDATION

Plaintiff Terry Dale Tilmon, a prisoner at Richland Parish Detention Center ("RPDC")

proceeding pro se and in forma pauperis, filed this proceeding on approximately November 22,

2021, under 42 U.S.C. § 1983.  He names the following defendants in their individual and

official capacities: the Chairman of the Union Parish Detention Center Commission ("UPDCC"),

the UPDCC, the Union Parish Police Jury, Secretary James LeBlanc, the State of Louisiana,

Corrections Officer Fields, Corrections Officer Hill, Corrections Officer McElroy, and

Superintendent/Warden Donnie Adams.[1,2]

For reasons that follow, the Court should retain the following claims:[3]

   (1) Plaintiff's Section 1983 claims—against the UPDCC Chairman,
   Superintendent Adams, the UPDCC, the UPPJ, and Secretary LeBlanc—that he
   was exposed to unreasonably high levels of e-cigarette and marijuana smoke;

---

[1] Plaintiff uses 'Superintendent' and 'Warden' interchangeably when referring to Adams.

[2] This matter has been referred to the undersigned for review, report, and recommendation under
28 U.S.C. § 636 and the standing orders of the Court.

[3] The undersigned directed the Clerk of Court, in a separate Memorandum Order, to serve
Plaintiff with summons forms for these claims.

(2) Plaintiff's claim that the UPDCC and the UPPJ negligently exposed him to environmental tobacco smoke by failing to adequately staff the facility;

(3) Plaintiff's claims—against the UPDCC Chairman, Superintendent Adams, the UPDCC, and the UPPJ—that "extreme levels of synthetic marijuana smoke" prevented him from practicing his religion;

(4) Plaintiff's claims—against the UPDCC Chairman in his or her official capacity, Superintendent Adams in his official capacity, the UPDCC, and the UPPJ—that "extreme levels of synthetic marijuana smoke" violated the Religious Land Use and Institutionalized Persons Act;

(5) Plaintiff's conditions-of-confinement claims—against UPDCC, UPPJ, the UPDCC Chairman, and Secretary Leblanc—concerning the presence of insects, rust, peeling paint, mold, mildew, dust, lack of ventilation, and wet floors;

(6) Plaintiff's negligence claim that the UPDCC and the UPPJ breached their duty to control the insects in UPDC;

(7) Plaintiff's claim—against the UPDCC, the UPDCC Chairman, the UPPJ, and Superintendent Adams—that he slipped and fell on water that collected beneath a water fountain; and

(8) Plaintiff's retaliation claim against Superintendent Adams.

The Court should dismiss the following claims:

(1) Plaintiff's Religious Land Use and Institutionalized Persons Act claims against defendants in their individual capacities;

(2) Plaintiff's claim that the UPDCC does not use proper equipment for the safe disposal of fluorocarbons and other toxins;

(3) Plaintiff's condition-of-confinement claims concerning: (a) the lack of operable showers and basins; (b) difficulty sleeping due to a constantly operating shower; (c) his fear of electrocution from water leaking near light fixtures; and (d) scalding shower water;

(4) Plaintiff's medical care claim against Superintendent Adams;

(5) Plaintiff's claims that Superintendent Adams and Officer Hill opened his legal mail in his absence;

(6) Plaintiff's claim that Superintendent Adams interfered with mail he sent to the Parole Board;

(7) Plaintiff's claim that he lost a prior civil rights action because of Superintendent Adams' interference;

(8) Plaintiff's claims against Officer Fields, Officer McElroy, and the State of Louisiana;

(9) Plaintiff's request to charge defendants with crimes; and

(10) Plaintiff's official-capacity claims against Secretary LeBlanc.

## **Background**

Plaintiff claims that he was "subjected to extreme levels of environmental tobacco and synthetic marijuana smoke." [doc. # 1, p. 5]. He alleges:

9. Although the facility has in place non-smoking policies, such policies are not enforced due to inadequate staffing to enforce said policy.

10. Moreover, tobacco products are sold in the facility's commissary. (E-Cigarettes).

11. [T]he facility does not offer non-smoking housing units for non-smokers who desire to avoid breathing second-hand smoke.

12. Smoke in housing dormitories [is] so prevailing that such smoke appears like fog on occasions and even has stained the walls of his living area.

13. It is not uncommon that employees complain about the odor and density of tobacco and synthetic marijuana.

14. Huge amounts of tobacco and synthetic marijuana are smuggled into the facility daily due to inadequate staffing.

15. [T]he UPDCC is aware of the dangers of second-hand smoke as [Plaintiff] regularly experiences headaches, coughing, sneezing, rises in blood pressure ([Plaintiff] suffers from hypertension) loss of appetite, [and] sleeplessness.

*Id.* at 5-6. Plaintiff also experienced "nose bleeds." [doc. # 12, p. 1].

Plaintiff states that "the conditions began on June 24, 2019," and ended October 22, 2021, when he transferred to RPDC. *Id.* at 2, 5. He faults the UPDCC Chairman for failing to enforce non-smoking policies and failing to prevent the introduction of tobacco and synthetic

3

marijuana. *Id.* at 2. He also faults the UPPJ, Superintendent Adams, the UPDCC, and Officer McElroy. [doc. #s 1, p. 14; 12, pp. 3, 5, 6].

Plaintiff claims that he was unable to practice his religion because of the environmental marijuana smoke. [doc. # 1, p. 6]. The smoke caused him to experience a "euphoric state of mind[,]" and "he is not to perform prayer in such a state of mind" under his Islamic faith. The "presence of synthetic marijuana smoke in dormitory housing substantially burdens his ability to practice his religious beliefs" because he has "had to abandon numerous prayers . . . ." *Id.* He must pray five times each day, but he was unable to do so at least three times each day due to the synthetic marijuana smoke. [doc. # 12, p. 2]. He writes: "There is no alternative to prayer." *Id.*

Plaintiff claims that "UPDCC has in place a policy and practice of inadequately equipping their maintenance department with proper equipment for the safe disposal of fluorocarbons and other toxins." [doc. # 1, pp. 6-7]. He maintains that the "Environmental Protection Agency mandates special equipment be utilized for the safe disposal of toxins such as fluorocarbons." *Id.* at 7. He claims that the "maintenance personnel at the facility will intentionally release the toxins directly into the environment without the use of any device to capture said toxins." *Id.*

Plaintiff claims that the UPDC was infested with cockroaches, bed bugs, and gnats. [doc. # 1, p. 8]. The "presence of vermin [did] not abate" throughout his "entire stay at UPDC[.]" *Id.* He alleges that "the presence of vermin without effective pest control services has the potential to cause disease . . . ." *Id.*

Plaintiff claims that the plumbing at UPDC was "faulty." *Id.* He was assigned to "dormitory 'K[,]'" which housed 54 offenders but had only one operable shower and one operable "face basin." [doc. # 1, p. 9]. Plaintiff feared electrocution because the "faucets

4

constantly leaked" around light fixtures. *Id.* The shower "runs throughout the night creating noise that makes it difficult to sleep . . . ." *Id.* "Whenever a commode is flushed, the cold water will automatically shut off which causes the person showering to be scalded." *Id.* Offenders are occasionally "forced to drink water from the commodes" because the "majority of the cells" lacked running water. *Id.*

Plaintiff claims that all housing areas were "infested with black mold and mildew . . . ." [doc. # 1, p. 9]. Ventilation filters were clogged with inches of dust, impeding air flow and the ability to vent synthetic marijuana smoke. *Id.* at 9-10. Lighting fixtures were "soiled with thick dust . . . ." *Id.* at 10.

On November 22, 2020, in "'M' dormitory[,]" Plaintiff slipped and fell on a "puddle of water that collected on the floor beneath and around the water fountain." [doc. # 1, p. 11]. He claims that the water fountain was faulty because its stream extended beyond the basin. *Id.* He experienced numbness in his fingers, limited movement in his left arm, and pain in his left shoulder, hip, neck, and "cervical area[.]" *Id.* He alleges that "there were no wet floor signs warning of the floor's condition." *Id.* Plaintiff and "others have reported the condition of the water fountain to maintenance, correction officers, and the warden to no avail." *Id.*

Plaintiff maintains that following his fall, medical personnel only glanced at his shoulder and failed to "take any vital signs[.]" [doc. # 1, p. 11]. He also states that he did not receive "any outside medical care or examination by a trained orthopedist." *Id.* at 12. He claims that Superintendent Adams did not grant the medical department the approval to send him to "outside medical care." [doc. # 12, pp. 4, 7].

Plaintiff claims that Superintendent Adams and Officer Hill opened his legal mail in his absence. [doc. #s 1, pp. 10-11; 12, pp. 3-4, 6].

Plaintiff applied for a parole rehearing in April 2021. [doc. # 12, p. 4]. He claims that the Parole Board has not responded because Superintendent Adams "obstruct[ed]" Plaintiff's mail to "attorneys, courts, or state agencies out of fear [that] the correspondence" concerned conditions at the facility. *Id.*

On June 16, 2020, in *Tilmon v. James LeBlanc, et al.*, 3:20-cv-0348, Doc. 8, (W.D. La. 2020), this Court struck Plaintiff's complaint and closed the proceeding because Plaintiff failed to pay the full filing fee or file a completed in forma pauperis application. In the instant proceeding, Plaintiff claims that Adams is responsible for his stricken pleading in the aforementioned proceeding, maintaining that Adams "stopped his in forma pauperis application out of fear it was an action against" UPDC. [doc. # 12, p. 4].

Plaintiff claims that Adams fired him from his position at the UPDC law library and transferred him to RPDC because Plaintiff showed him a grievance and a copy of his initial pleading in this proceeding. [doc. # 12, p. 5].

Plaintiff seeks nominal, compensatory, and punitive damages, and he asks the Court to file criminal charges against defendants. *Id.*

## Law and Analysis

**1. Preliminary Screening**

Plaintiff is a prisoner who has been permitted to proceed in forma pauperis. As a prisoner seeking redress from an officer or employee of a governmental entity, his complaint is subject to preliminary screening pursuant to 28 U.S.C. § 1915A.[4]  *See Martin v. Scott,* 156 F.3d

---

[4] Under 28 U.S.C. § 1915(h), "'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."

578, 579-80 (5th Cir. 1998) (*per curiam*).  Because he is proceeding in forma pauperis, his

Complaint is also subject to screening under § 1915(e)(2).  Both § 1915(e)(2)(B) and § 1915A(b)

provide for *sua sponte* dismissal of the complaint, or any portion thereof, if the Court finds it is

frivolous or malicious, if it fails to state a claim on which relief may be granted, or if it seeks

monetary relief against a defendant who is immune from such relief.

A complaint is frivolous when it "lacks an arguable basis either in law or in fact."

*Neitzke v. Williams,* 490 U.S. 319, 325 (1989).  A claim lacks an arguable basis in law when it is

"based on an indisputably meritless legal theory." *Id.* at 327.  Courts are also afforded the

unusual power to pierce the veil of the factual allegations and dismiss those claims whose factual

contentions are clearly baseless.  *Id.*

A complaint fails to state a claim on which relief may be granted when it fails to plead

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,*

550 U.S. 544, 570 (2007); accord *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  A claim is

facially plausible when it contains sufficient factual content for the court "to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing

*Twombly*, 550 U.S. at 570).  Plausibility does not equate to possibility or probability; it lies

somewhere in between.  *Id.*  Plausibility simply calls for enough factual allegations to raise a

reasonable expectation that discovery will reveal evidence to support the elements of the claim.

*Twombly*, 550 U.S. at 556.

Assessing whether a complaint states a plausible claim for relief is a "context-specific

task that requires the reviewing court to draw on its judicial experience and common sense."

*Iqbal, supra.*  A well-pled complaint may proceed even if it strikes the court that actual proof of

the asserted facts is improbable and that recovery is unlikely.  *Twombly, supra*.

In making this determination, the court must assume that all of the plaintiff's factual allegations are true. *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998). However, the same presumption does not extend to legal conclusions. *Iqbal, supra*. A pleading comprised of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not satisfy Rule 8. *Id*. "[P]laintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." *City of Clinton, Ark. v. Pilgrim's Pride Corp*, 632 F.3d 148, 152-53 (5th Cir. 2010). Courts are "not free to speculate that the plaintiff 'might' be able to state a claim if given yet another opportunity to add more facts to the complaint." *Macias v. Raul A. (Unknown) Badge No. 153*, 23 F.3d 94, 97 (5th Cir. 1994).

A hearing need not be conducted for every pro se complaint. *Wilson v. Barrientos*, 926 F.2d 480, 483 n.4 (5th Cir. 1991). A district court may dismiss a prisoner's civil rights complaint as frivolous based upon the complaint and exhibits alone. *Green v. McKaskle*, 788 F.2d 1116, 1120 (5th Cir. 1986).

"To state a section 1983 claim, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (internal quotation marks omitted). Consistent with the standard above, a "[S]ection 1983 complaint must state specific facts, not simply legal and constitutional conclusions." *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir. 1990).

## 2. Exposure to Environmental E-Cigarette and Synthetic Marijuana Smoke

The Court should retain Plaintiff's Section 1983 claims—against the UPDCC Chairman, Superintendent Adams, the UPDCC, the UPPJ, and Secretary LeBlanc—that he was exposed to unreasonably high levels of e-cigarette and marijuana smoke. *See generally Helling v.*

*McKinney*, 509 U.S. 25, 35 (1993); *Murrell v. Casterline*, 307 F. App'x 778, 779 (5th Cir. 2008); *Bruce v. Little*, 568 F. App'x 283, 286 (5th Cir. 2014); *Black v. Concordia Par. Det. Ctr.*, 607 F. App'x 440, 441 (5th Cir. 2015).

The Court should dismiss the same claim against Officer McElroy. Plaintiff alleges that McElroy, the commissary clerk, was responsible for purchasing e-cigarettes "for sale to offenders." [doc. # 12, p. 6]. McElroy was allegedly "aware of the dangers of nicotine." *Id.* However, Plaintiff does not allege that McElroy knew Plaintiff was exposed to allegedly high levels of e-cigarette smoke in the facility.[5]

The Court should retain Plaintiff's claims that the UPDCC and the UPPJ negligently exposed him to environmental tobacco smoke by failing to adequately staff the facility. [doc. # 1, p. 14].

**3. Religious Exercise**

The Court should retain Plaintiff's claims—against the UPDCC Chairman, Superintendent Adams, the UPDCC, and the UPPJ—that "extreme levels of synthetic marijuana smoke" violated his rights under the First Amendment.

The Court should retain the same allegations against the same defendants in their official capacities only, under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). To the extent Plaintiff raises RLUIPA claims against defendants in their individual capacities,

---

[5] Plaintiff mentions that McElroy acted in concert with the UPDCC and Superintendent Adams because they were "aware their actions [were] illegal." [doc. # 12, p. 6]. Plaintiff's threadbare allegation does not suffice to establish a conspiracy: "[c]onclusory allegations that do not reference specific factual allegations tending to show an agreement do not suffice to state a civil rights conspiracy claim under § 1983." *See Montgomery v. Walton*, 759 F. App'x 312, 314 (5th Cir. 2019).

the Court should dismiss the claims.  The RLUIPA "does not provide any cause of action for individual-capacity claims." *Jones v. Alfred*, 353 F. App'x 949, 951 (5th Cir. 2009).

**4. Conditions of Confinement**

"While the Constitution does not require that custodial inmates be housed in comfortable prisons, the Eighth Amendment's prohibition against cruel and unusual punishment does require that prisoners be afforded 'humane conditions of confinement' and prison officials are to ensure that inmates receive adequate food, shelter, clothing, and medical care." *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001) (*quoting Farmer v. Brennan*, 511 U.S. 825 (1994)).  To establish an Eighth Amendment violation, a prisoner must demonstrate that a prison official was deliberately indifferent to conditions that resulted in the "extreme deprivation[,]" *Shannon v. Vannoy*, 682 F. App'x 283, 285 (5th Cir. 2017), of "the minimal civilized measure of life's necessities."[6]  *Hernandez v. Velasquez*, 522 F.3d 556, 560 (5th Cir. 2008).  To establish deliberate indifference, the prisoner must show that the official knew of and disregarded an excessive risk to inmate health or safety; the official must have been both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must have drawn the inference.  *Farmer*, 511 U.S. at 837.

"*Some* conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue

---

[6] The deprivation alleged must be, objectively, sufficiently serious.  *Farmer*, 511 U.S. at 834. This standard is not static: the inquiry is whether the conditions are contrary to "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quotation marks and quoted source omitted).

blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (internal quotation marks and quoted source omitted).[7]  However, "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* at 305.

### A. Fluorocarbons

Plaintiff claims that "UPDCC has in place a policy and practice of inadequately equipping [its] maintenance department with proper equipment for the safe disposal of fluorocarbons and other toxins."  [doc. # 1, pp. 6-7].  He maintains that the "Environmental Protection Agency mandates special equipment be utilized for the safe disposal of toxins such as fluorocarbons."  *Id.* at 7.  The "maintenance personnel at the facility will intentionally release the toxins directly into the environment without the use of any device to capture said toxins."  *Id.* Plaintiff was concerned about "his current and future health," alleging that the "release of such toxins" exposed him to a "pervasive risk of harm."  *Id.*  He warned Superintendent Adams that fluorocarbons have the "potential to cause women to miscarry during pregnancy."  [doc. # 12, p. 5].

To the extent Plaintiff claims that the defendants violated Environmental Protection Agency regulations, he does not state a viable claim.  A Section 1983 claim may not "be brought to enforce an administrative regulation . . . ."  *Thurman v. Med. Transportation Mgmt., Inc.*, 982 F.3d 953, 957 (5th Cir. 2020), *cert. denied,* 142 S. Ct. 358 (2021).  "[A]gency regulations cannot

---

[7] "Such things as food, sleep, clothing, shelter, medical attention, reasonable safety, sleep, and exercise have been recognized by courts as basic physical human needs subject to deprivation by conditions of confinement."  *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 678 (M.D. La. 2007) (citing cases).

independently confer federal rights enforceable under § 1983 for one simple reason: . . . it is Congress, and not an agency of the Executive Branch, that creates federal rights." *Id.*

The violation of a safety or health code would only be "instructive in certain cases," would only establish recommended goals, and would "not establish the constitutional minima . . . ." *Bell v. Wolfish*, 441 U.S. 520, n. 27 (1979); *see Sampson v. King*, 693 F.2d 566, 569 (5th Cir. 1982) ("In operating a prison, however, the state is not constitutionally required to observe all the safety and health standards applicable to private industry.  Nor is it bound by the standards set by the safety codes of private organizations. Standards suggested by experts are merely advisory. A federal court required to gauge the conduct of state officials must use minimum constitutional standards as the measure.").

If Plaintiff does not rely on the regulations and instead raises a conditions-of-confinement or negligence claim, he lacks standing because he does not allege that he suffered harm or that he will imminently suffer harm.[8]  Rather, he only alleges conjectural risks, stating that the improper release or storage of fluorocarbons and other unspecified toxins could potentially harm him, the public, other prisoners, and pregnant women.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (recognizing that, to have standing, a plaintiff must have suffered an injury in fact that is "actual or imminent, not conjectural or hypothetical[.]") (citations and internal quotation marks omitted).[9]

---

[8] To reiterate, Plaintiff is no longer confined in UPDC.

[9] *See also Thompson v. Scott*, 86 F. App'x 17, 18 (5th Cir. 2004) (holding that because an inmate alleged no injury from a policy, he had no standing to raise a claim); *Colgrove v. Collins*, 62 F.3d 391 (5th Cir. 1995) (holding that a "speculative claim of injury is insufficient to satisfy Article III's requirements for standing.").

Even assuming Plaintiff did allege that he suffered harm or will imminently suffer harm, he fails to state a plausible claim. Plaintiff does not plausibly allege that he was exposed to fluorocarbons or other toxins. At best, he alleges that maintenance personnel released "the toxins directly into the environment . . . ." [doc. # 1, p. 7]. Even assuming Plaintiff alleged that he was exposed, he does not allege the extent to which he was exposed, thus failing to describe an extreme deprivation of safety or health. While he describes a risk, he does not allege that *he* was exposed to a *substantial* risk of serious harm. The Court should dismiss these claims.

### B. Insects, Rust, Peeling Paint, Mold, Mildew, Dust, Lack of Ventilation, and Wet Floors

Plaintiff claims that the UPDC was infested with cockroaches, bed bugs, and gnats. [doc. # 1, p. 8]. The "presence of vermin [did] not abate" throughout his "entire stay at UPDC[.]" *Id.* He alleges that "the presence of vermin without effective pest control services has the potential to cause disease . . . ." *Id.* The insects crawled on him at night, making it impossible to sleep. *Id.* He suggests that bed bugs bit him, leaving "red sore blister like marks that last[ed] for days at a time." *Id.* He endured mental anguish, "pain from insect bites, sleeplessness, and fear of contracting disease . . . ." *Id.* at 15.

Plaintiff also alleges, "Due to faulty plumbing the housing areas are always wet with water on the floor adjacent to the restroom due to leaking pipes." *Id.* This condition allegedly generated "vermin such as gnats[,]" which "hover around food during meals times" and disturb sleep "by flying around your mouth, nose, and ears." *Id.*

Plaintiff claims that all "housing area[s] are infested with black mold and mildew . . . ." *Id.* at 9. "Ventilation filters are clogged with dust that appears to be three inches thick making it difficult for adequate flow of air." Ventilation filters were not replaced while Plaintiff was in UPDC. The lack of ventilation created "foggy conditions" due to tobacco and synthetic

marijuana smoke. *Id.* Plaintiff adds that the facility had rust and peeling paint. [doc. #s 1, p. 13; 12, p. 1].

Arguably, none of the conditions alone amounted to an extreme deprivation of an identifiable human need. And Plaintiff does not explicitly allege which conditions to which *he* was exposed. But construing his allegations liberally and in his favor, he states plausible claims: when combined, the conditions (including the alleged presence of tobacco and synthetic marijuana smoke)—which Plaintiff states were present for over two years—plausibly resulted in a sufficiently serious deprivation of health, sanitation, and safety. *See Wilson*, 501 U.S. at 304 ("*Some* conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need . . . .").[10]

Plaintiff faults Superintendent Adams, UPDCC, UPPJ, the UPDCC Chairman, and Secretary LeBlanc. He alleges that they knew of the conditions through his grievances.[11] [doc. #s 1, p. 15; 12, pp. 1, 2, 6-7]. While Plaintiff does not disclose the exact content of his

---

[10] *See generally Gillespie v. Crawford*, 833 F.2d 47, 50 (5th Cir. 1987), on reh'g, 858 F.2d 1101 (5th Cir. 1988) (holding that the following stated a claim: the plaintiffs' "cell block was overcrowded, had inadequate ventilation and lighting, and was dirt and insect infested."); *Smith v. Leonard*, 244 F. App'x 583 (5th Cir. 2007) (Allegations by state prisoner that prison official's failure to remove allegedly toxic mold from prison amounted to gross negligence, and that prisoner suffered symptoms of headaches, sinus problems, trouble breathing, blurred vision, irritated eyes, and fatigue stated an Eighth Amendment § 1983 claim); *Hope v. Harris*, 861 F. App'x 571, 584 (5th Cir. 2021).

[11] *See Black v. Concordia Par. Det. Ctr.*, 607 F. App'x 440, 441 (5th Cir. 2015) ("Black filed administrative complaints and wrote a letter to Goodwin alleging that the prison's smoking policy was not enforced and that his exposure to ETS aggravated his prostate cancer. When he was unsatisfied with the denial of his administrative complaint, Black appealed, and his appeal was denied by Leblanc or Leblanc's designee. Taking Black's allegations as true, he has stated a plausible claim that Goodwin and Leblanc knew he faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it.").

grievances or explicitly state that the defendants knew of the particular risks to him due to the conditions, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *See Farmer*, 511 U.S. at 842.

At this early stage of the proceeding, the Court should retain these Section 1983 claims. The Court should also retain Plaintiff's negligence claim that the UPDCC and the UPPJ breached their duty to "provide adequate pest control services to terminate vermin[,]" which caused Plaintiff to experience "mental anguish, pain from insect bites, sleeplessness, and fear of contracting disease . . . ." [doc. # 1, p. 15].

### C. Plumbing

Plaintiff claims that he was assigned to "dormitory 'K[,]'" which housed 54 offenders but had only one operable shower and one operable "face basin." [doc. # 1, p. 9]. However, he does not specify how the scarcity of showers and face basins impacted him. He also claims that the shower "runs throughout the night creating noise that makes it difficult to sleep . . . ." *Id.* But Plaintiff does not explain the extent to which he lacked sleep due to the shower. Ultimately, Plaintiff does not plausibly allege that he endured an extreme deprivation of, for example, the need to clean himself or the need to sleep. The alleged conditions, while unpleasant, did not amount to a constitutional violation.

Next, Plaintiff mentions that he fears electrocution. For context, the undersigned presents the allegation verbatim: "The shower area has only one shower that is operable for 54 offenders and constantly runs throughout the night creating noise that makes it difficult to sleep *as well as fear of being electrocuted due to water leaking around light fixtures*. [sic]." [doc. # 1, p. 9]. Plaintiff does not elaborate. He does not allege how long or how often water leaked from (presumably) the shower. He also does not explain where the light fixtures were from which he

15

feared electrocution.  In other words, he does not describe a substantial risk of serious harm or, concomitantly, an extreme deprivation of safety.[12]

Finally, Plaintiff claims that "[w]henever a commode is flushed, the cold water will automatically shut off which causes the person showering to be scalded."  He also claims that offenders were occasionally "forced to drink water from the commodes" because the "majority of the cells" lacked running water.  But Plaintiff does not allege that the shower water scalded him, that he could not shower because of the risk of scalding, or that he was forced to drink from a commode.  Consequently, he was not deprived of a minimal civilized measure of life's necessities or exposed to a substantial risk of serious harm.  To the extent he seeks relief on behalf of other prisoners, he lacks standing.  *Resendez v. Texas*, 440 F. App'x 305, 306 (5th Cir. 2011).

Plaintiff does briefly mention that he "spoke to Adams regarding being scalded . . . ." [doc. # 12, p. 5].  To the extent Plaintiff alleges that the shower water scalded him, he does not detail the severity of his injury (if any), he does not state how often he risked scalding, he does not explain whether scalding was easily avoidable (for example, by sidestepping the shower stream), and he does not state that he was at risk of scalding again.  At bottom, Plaintiff describes a risk of harm from the hot water, but he does not describe a *substantial* risk or the "unnecessary and wanton infliction of pain."  Further, he alleges that he spoke to Superintendent Adams *after* the water scalded him; thus, he does not plausibly allege that Adams knew of the risk before Plaintiff experienced any harm.  Also, Plaintiff writes specifically that he "spoke to Adams

---

[12] *C.f. Cotton v. Taylor*, 176 F.3d 479 (5th Cir. 1999) (conditions of confinement violated the Eighth Amendment where a plaintiff feared electrocution because water leaked on the floor every time it rained, causing electrical receptacles to spark and smoke).

regarding being scalded"; absent additional detail, this does not demonstrate that Adams knew of a substantial risk of serious harm.

The Court should dismiss these claims.

**5. Slip and Fall**

Plaintiff allegedly slipped and fell on a "puddle of water that collected on the floor beneath and around the water fountain." [doc. # 1, p. 11]. Plaintiff appears to fault the UPDCC, the UPDCC Chairman, the UPPJ, and Superintendent Adams. [doc. #s 1, pp. 11-12; 12, pp. 1, 3]. The Court should retain this claim under its supplemental jurisdiction.

**6. Medical Care**

Plaintiff states that medical personnel cursorily examined him after his fall. [doc. # 1, p. 11]. He claims, however, that he did not receive "any outside medical care or examination by a trained orthopedist." *Id.* at 12. He faults Superintendent Adams, alleging that Adams did not grant the medical department approval to send him to "outside medical care." [doc. # 12, pp. 4, 7].

Plaintiff does not state a claim of constitutional dimension. *See Petzold v. Rostollan*, 946 F.3d 242, 250 (5th Cir. 2019) ("[B]ecause medical treatment was provided, even if it was . . . based on a perfunctory and inadequate evaluation, it was not denied."). He is not constitutionally entitled to always see the medical professional of his choice. Prisoners are not entitled to "the best [care] that money could buy . . . ." *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992); *Saldivar v. Davis*, 698 F. App'x 198, 199 (5th Cir. 2017).

Absent more, the lack of care from a specialist or from an "outside" or off-premises provider does not constitute deliberate indifference. *See Davis v. Hough*, 569 F. App'x 186 (5th Cir. 2014) (finding no deliberate indifference where the prisoner-plaintiff claimed that he was

not sent to "an outside medial facility"); *Davis v. Mississippi Dep't of Corr.*, 134 F. App'x 760 (5th Cir. 2005) (opining that "complaints about . . . the lack of further opinions from specialists do not rise to the level of deliberate indifference."); *Wilson v. Grimes*, 770 F. App'x 218, 219 (5th Cir. 2019) (finding that the plaintiff only disagreed with his medical treatment where he alleged that because he was not sent to a specialist, his diagnosis of, and treatment for, cancer was late and required him to undergo a laryngectomy).

The Court should dismiss this claim.

## 7. Opening Mail

Plaintiff claims that Superintendent Adams and Officer Hill opened his legal mail in his absence. [doc. #s 1, pp. 10-11; 12, pp. 3-4, 6].

Plaintiff does not state a plausible claim on which relief can be granted because "prison officials may open incoming legal mail to inspect it for contraband." *Jones v. Mail Room Staff*, 74 F. App'x 418, 419 (5th Cir. 2003) (*citing Brewer v. Wilkinson*, 3 F.3d 816, 820-21 (5th Cir. 1993)). Similarly, "prisoners do not have a constitutional right to be present when privileged, legal mail is opened and inspected." *Collins v. Foster*, 603 F. App'x 273, 275 (5th Cir. 2015) (*citing Brewer*, 3 F.3d at 825).

The Court should dismiss this claim.

## 8. Interfering with Outgoing Mail

Plaintiff applied for a parole rehearing in April 2021. [doc. # 12, p. 4]. He claims that the Parole Board has not responded because Superintendent Adams "obstruct[ed]" his mail to "attorneys, courts, or state agencies out of fear [that] the correspondence" concerned conditions at the facility. *Id.*

18

A complaint fails to state a claim on which relief may be granted when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. A civil rights plaintiff must support his claims with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations. *Ashcroft*, 556 U.S. at 662.

Here, even construed liberally and in his favor, Plaintiff's claim is speculative and conclusory. He does not allege that Adams prevented him from filing before the Parole Board. Rather, he speculates that Adams may have interfere with his application or other filing because (1) he has not received a response and (2) Adams has "obstructed" his mail to attorneys, courts, or state agencies. Also, to the extent Plaintiff claims that Adams interfered with his access to the courts, Plaintiff does not allege that he lost his rehearing because of Adams' action or inaction.

### 9. Access to Courts

Plaintiff filed *Tilmon v. James LeBlanc, et al.*, 3:20-cv-0348 (W.D. La. 2020), on approximately March 18, 2020. On March 19, 2020, the Court ordered Plaintiff to, within thirty days, submit either the $400.00 to file a complaint or a completed application to proceed in forma pauperis ("IFP"). *Id.* at Doc. 3. On April 22, 2020, Plaintiff moved for a fifteen-day extension of time in which to pay the full filing fee, maintaining that he intended to pay the full filing fee but the "prison business office [was] slow processing" requests for funds due to the Covid-19 virus. *Id.* at Doc. 4. The Court granted Plaintiff's motion, allowing him fifteen additional days to either pay the full filing fee or apply to proceed IFP. *Id.* at Doc. 5.

On May 15, 2020, Plaintiff applied to proceed IFP, but he did not file a completed accounts officer page, which is the last page of the application. *Id.* at Doc. 6. Although he applied for IFP status, he also attached an exhibit demonstrating that he possessed the funds to pay the full filing fee. *Id.* at Doc. 6-1. He filed a letter the same day, informing the Court that

the facility's inmate account officer would not respond to his request to withdraw the full filing fee from his account or complete the accounts officer form. *Id.* at Doc. 7. He added that the officer may have been in quarantine (presumably due to the Covid-19 virus Plaintiff mentioned previously). *Id.* He advised the Court that he would "have to file a grievance which [would] take approximately 20 days to take effect." *Id.*

One month elapsed following Plaintiff's letter, exhibit, and deficient IFP application, and Plaintiff did not file any other documents. Because Plaintiff did not pay the full filing fee, file a completed IFP application, seek an extension of time, or seek the Court's assistance in obtaining a completed accounts officer form, the Court struck Plaintiff's pleading and closed the proceeding. *Id.* at 8. Plaintiff did not move to reinstate the proceeding, and he did not appeal.

In the instant proceeding, Plaintiff claims that Superintendent Adams is responsible for his stricken pleading in the aforementioned proceeding. [doc. # 12, p. 4]. He claims that Adams "stopped his in forma pauperis application out of fear it was an action against" UPDC. *Id.*

To succeed on claim that a defendant is violating a plaintiff's right to access the courts, the plaintiff must show that he lost an actionable claim or was prevented from presenting such a claim because of the alleged denial. *Lewis v. Casey*, 518 U.S. 343, 356 (1996). The "injury requirement is not satisfied by just any type of frustrated legal claim." *Id.* at 353. Rather, a plaintiff must demonstrate that the lack of access prevented him from filing or caused him to lose a pending case that attacks either his conviction or seeks "to vindicate 'basic constitutional rights'" in a civil rights action under 42 U.S.C. § 1983. *Id.* at 353-54 (*quoting Wolff v. McDonnell*, 418 U.S. 539, 579 (1974)).

"Denial-of-access claims take one of two forms: forward-looking claims alleging 'that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the

present time,' and backward-looking claims alleging that an official action has 'caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief.'" *Waller v. Hanlon*, 922 F.3d 590, 601 (5th Cir. 2019) (*quoting Christopher*, 536 U.S. at 413-14).

"To maintain a backward-looking claim, a plaintiff must identify (1) a nonfrivolous underlying claim; (2) an official act that frustrated the litigation of that claim; and (3) a remedy that is not otherwise available in another suit that may yet be brought." *United States v. McRae*, 702 F.3d 806, 830-31 (5th Cir. 2012); *see Christopher*, 536 U.S. at 413-14 (("These cases do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable.").

Here, Plaintiff does not plausibly allege that Adams' action or inaction was the proximate cause of Plaintiff's stricken proceeding. To explain, Plaintiff alleges that Adams "stopped his in forma pauperis application . . . ." [doc. # 12, p. 4]. However, Plaintiff twice maintained in the prior proceeding that he possessed adequate funds to pay the filing fee and had "every intention of submitting the entire fee." *Tilmon*, 3:20-cv-0348, Docs. 4, 7. He stated in his IFP application that he had $5,404.00 in his account. *Id.* at Doc. 6. He attached an exhibit which purportedly revealed that he had $5,912.49 in his account. *Id.* at Doc. 6-1. Plaintiff's funds exceeded the IFP threshold; he did not qualify to proceed IFP.

Consequently, even if Adams did not interfere with the IFP application and Plaintiff was able to file it, the Court would have denied the application and instructed Plaintiff to pay the full filing fee. Critically, Plaintiff does not allege that Adams interfered with his ability to withdraw his funds and pay the filing fee. Rather, Plaintiff maintained in the prior action that he could not

access or withdraw funds because the facility's inmate accounts officer did not respond to his request.  Accordingly, Adams' alleged interference with Plaintiff's IFP application was not the cause of Plaintiff's stricken proceeding.  *See Johnson v. Atkins*, 999 F.2d 99, 100 (5th Cir. 1993) ("Johnson made no claim that he was indigent or that he could not afford court costs pursuant to art. 5181. Thus he was not denied access to the courts by fees that were too high, because he was able to supply the necessary funds.").

The Court should dismiss this claim.

**10. Retaliation**

Plaintiff claims that Superintendent Adams fired him from his inmate counsel substitute position at the UPDC law library and then transferred him to RPDC because Plaintiff showed him a grievance and a copy of his initial pleading in this proceeding.  [doc. # 12, p. 5].

To prevail on a retaliation claim, a plaintiff must prove: (1) the exercise of a specific constitutional right; (2) the defendants' intent to retaliate for the exercise of that right; (3) a retaliatory adverse act; and (4) causation, which in this context means that, but for the retaliatory motive, the complained of incident would not have occurred.  *McDonald v. Steward*, 132 F.3d 225, 2331 (5th Cir. 1998).  Courts must "carefully scrutinize" retaliation claims to "assure that prisoners do not inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around them."  *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995).[13]

A plaintiff must produce direct evidence of motivation or allege a chronology of events from which retaliation may be plausibly inferred.  *Woods v. Smith*, 60 F.3d 1161 (5th Cir. 1995).

---

[13] "The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." *Id.* (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)).

"Mere conclusory allegations of retaliation are insufficient[,] . . . a plaintiff must allege more than his personal belief that he has been the victim of retaliation." *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999). With respect to the third prong above, "Retaliation against a prisoner is actionable only if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights." *Smith v. Hebert*, 533 F. App'x 479, 482 (5th Cir. 2013).

Here, with respect to the first prong of the standard above, Plaintiff suggests that he exercised his First Amendment rights when he "presented to Adams a grievance and a copy of the instant original complaint." [doc. # 12, p. 5]. Plaintiff does not specify whether he merely confronted Adams or if he was using the facility's grievance system properly. In *Hanna v. Maxwell*, 415 F. App'x 533, 536 (5th Cir. 2011), the Fifth Circuit found that a plaintiff who "alleged retaliation after threatening to file a lawsuit during a confrontation with corrections officers" did not state a plausible claim because, while "complaining about the conduct of corrections officers through proper channels is a constitutionally protected activity," the plaintiff "did not allege that he suffered retaliation after complaining through proper channels . . . ." Here, construing the allegations liberally and in Plaintiff's favor, Plaintiff plausibly alleges that he was complaining through proper channels. *See generally Butts v. Martin*, 877 F.3d 571, 589 (5th Cir. 2017).

Plaintiff also fulfills the second and fourth prongs at this stage of the proceeding. *See Petzold v. Rostollan*, 946 F.3d 242, 252 (5th Cir. 2019) ("To prove intent and causation, the prisoner must at least establish a 'chronology of events from which retaliation may be plausibly inferred.'"). He plausibly alleges a chronology of events from which retaliation may be plausibly inferred, maintaining that he presented a grievance to Adams on October 21, 2021, and that Adams removed him from his position the next day. *See Allen v. Thomas*, 388 F.3d 147,

150 (5th Cir. 2004); *Gonzales v. Gross*, 779 F. App'x 227, 230 (5th Cir. 2019).

As to the third prong, if Plaintiff only claimed that Adams transferred him to RPDC, he would not plausibly allege a retaliatory adverse act. "[A] claim that an inmate was transferred to a more dangerous prison in retaliation for an exercise of a constitutional right will support a Section 1983 claim." *Ward v. Fisher*, 616 F. App'x 680, 684 (5th Cir. 2015). Plaintiff does not allege that RPDC is more dangerous than, or significantly inferior to, UPDC.

However, Plaintiff also states that Adams fired him from his position as inmate counsel substitute. Plaintiff does not disclose the impact of his termination; for example, he does not state whether he was paid for this position or whether he obtained another job or position when he arrived at RPDC. Of note, a demotion to another prison position or a "lateral move between similar positions" would not "deter the ordinary person from further exercise of his rights." *Zebrowski v. U.S. Fed. Bureau of Prisons*, 558 F. App'x 355, 358 (5th Cir. 2014). But Plaintiff does not allege that he was only demoted or transferred laterally. Rather, he was fired. This action plausibly amounts to a greater-than-de-minimis action which would deter a person of ordinary firmness from further exercising his constitutional rights.[14]

The Court should retain this claim against Adams.

**11. Officer Fields**

Plaintiff names Officer Fields as a defendant, but he does set forth any allegations against

---

[14] Some courts cite *Tighe v. Wall*, 100 F.3d 41, 42 (5th Cir. 1996), for the proposition that firing an inmate from a position at a prison or detention facility does not amount to retaliation because the prisoner has no constitutionally protected interest in a specific work assignment. However, this reasoning is misplaced. The *Tighe* court stated that a prisoner has no constitutionally protected interest in a specific work assignment only to explain that the plaintiff was not exercising a constitutional right when he provided legal assistance to fellow inmates. *Id.*

Officer Fields.[15]  Thus, the Court should dismiss Officer Fields.

**12. . Separation of Powers**

Plaintiff asks the Court to charge defendants with crimes.  [doc. # 1, p. 16].  There is no constitutional right to have a person criminally prosecuted.  *Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990).[16]  Investigating and prosecuting possible criminal activities lies in the exclusive jurisdiction of the executive branch of government.  In the federal context, for example, prosecuting criminal actions lies in the discretion of the Attorney General of the United States and duly authorized United States Attorneys.  In Louisiana, prosecuting criminal actions lies in the discretion of the Louisiana Attorney General and the various District Attorneys.  *See* LA. CODE. CRIM. PROC. arts. 61 and 62.

Plaintiff should direct his concerns to a local, state, or federal police agency.  Plaintiff should be aware that if a prosecuting authority investigates and chooses not to file charges, "[t]he decision to file or not file criminal charges . . . will not give rise to section 1983 liability." *Oliver*, 904 F.2d at 281.  The courts "allow the government discretion to decide which individuals to prosecute, which offenses to charge, and what measure of punishment to seek." *U.S. v. Lawrence*, 179 F.3d 343, 348 (5th Cir. 1999).

Accordingly, the Court should dismiss Plaintiff's request.

---

[15] The undersigned instructed Plaintiff to provide a separate description of what, exactly, each defendant did to violate his rights.  [doc. # 11].

[16] *See U.S. v. Batchelder*, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion."); *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.").

**13. Secretary LeBlanc**

Plaintiff names Secretary LeBlanc as a defendant in his individual and official capacities. Liability under 42 U.S.C. § 1983 only applies to "person[s]" who deprive others of rights secured by the Constitution.  In that respect, "State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them." *Hafer v. Melo*, 502 U.S. 21, 27 (1991).  "[T]he real party in interest in an official-capacity suit is the governmental entity and not the named official . . . ." *Id.*

Here, the State of Louisiana employs LeBlanc.  "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).   Accordingly, the Court should dismiss Plaintiff's official-capacity claims against LeBlanc.

**14. State of Louisiana**

Plaintiff names the State of Louisiana as a defendant.  [doc. # 1, p. 15].  He appears to claim that the State was negligent in failing to adequately monitor or supervise the UPDCC.  *Id.*

"State sovereign immunity divests federal courts of jurisdiction over states and their agencies and instrumentalities, unless the state consents to suit or Congress has clearly and validly abrogated the state's sovereign immunity." *Canada Hockey, L.L.C. v. Texas A&M Univ. Athletic Dep't*, No. 20-20503, 2022 WL 445172, at *3 (5th Cir. Feb. 14, 2022).  Louisiana has not waived its sovereign immunity or otherwise consented to suit, and Congress has not abrogated Louisiana's sovereign immunity.  *Richardson v. Southern University*, 118 F.3d 450, 453 (5th Cir. 1997); *Price v. Shorty*, 632 F. App'x 211, 212 (5th Cir. 2016); La Rev. Stat. §

26

13:5106(A).[17]

The Court should dismiss Plaintiff's claim against the State of Louisiana because the State is entitled to sovereign immunity.

### Recommendation

For the reasons above, **IT IS RECOMMENDED** that the following be **DISMISSED** as frivolous and for failure to state a claim on which relief may be granted:

(1) Plaintiff Terry Dale Tilmon's Religious Land Use and Institutionalized Persons Act claims against defendants in their individual capacities;

(2) Plaintiff's claim that the UPDCC does not use proper equipment for the safe disposal of fluorocarbons and other toxins;

(3) Plaintiff's condition-of-confinement claims concerning: (a) the lack of operable showers and face basins; (b) difficulty sleeping due to a constantly operating shower; (c) his fear of electrocution from water leaking near light fixtures; and (d) scalding shower water;

(4) Plaintiff's medical care claim against Superintendent Adams;

(5) Plaintiff's claim that Superintendent Adams and Officer Hill opened his legal mail in his absence;

(6) Plaintiff's claim that Superintendent Adams interfered with mail he sent to the Parole Board;

(7) Plaintiff's claim that he lost a prior civil rights action because of Superintendent Adams' interference;

(8) Plaintiff's claims against Officer Fields and Officer McElroy;

(9) Plaintiff's request to charge defendants with crimes; and

(10) Plaintiff's official-capacity claims against Secretary LeBlanc.

---

[17] *See also Hanna v. LeBlanc*, 716 F. App'x 265, 268 (5th Cir. 2017) ("[Section] 1983 does not abrogate state sovereign immunity[.]"); *Fairley v. Stalder*, 294 F. App'x 805, 811 (5th Cir. 2008).

**IT IS FURTHER RECOMMENDED** that Plaintiff's claims against the State of Louisiana be **DISMISSED WITHOUT PREJUDICE** as frivolous, for failing to state a claim on which relief may be granted, and for seeking monetary relief from a defendant immune from such relief.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).**

In Chambers, Monroe, Louisiana, this 29th day of March, 2022.

Kayla Dye McClusky
United States Magistrate Judge