**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

**TERRY DALE TILMON #81500**          **CASE NO. 3:21-CV-04037 SEC P**

**VERSUS**                                        **JUDGE TERRY A. DOUGHTY**

**CHAIRMAN ET AL.**                      **MAG. JUDGE KAYLA D. MCCLUSKY**

<u>**REPORT & RECOMMENDATION**</u>

Pending before the undersigned Magistrate Judge, on reference from the District Court, is a motion for summary judgment [doc. #81] filed by Defendants Union Parish Police Jury ("UPPJ"); Union Parish Detention Center Commission ("UPDCC"); Donnie Adams ("Warden Adams"); and Dusty Gates, Chairman of the Union Parish Detention Center Commission ("Chairman Gates") (collectively, "Defendants"). Also pending before the undersigned is a motion for copies [doc. #94], filed by Plaintiff Terry Dale Tilmon.

For reasons assigned below, IT IS RECOMMENDED that Defendants' motion for summary judgment [doc. #81], be GRANTED IN PART and DENIED IN PART. Furthermore, IT IS ORDERED that Plaintiff's motion for copies is DENIED.[1]

---

[1] As this motion is not excepted in 28 U.S.C. § 636(b)(1)(A), nor dispositive of any claim on the merits within the meaning of Rule 72 of the Federal Rules of Civil Procedure, this ruling is issued under the authority thereof, and in accordance with the standing order of this court. Any appeal must be made to the district judge in accordance with Rule 72(a) and L.R. 74.1.

**Background**

Plaintiff Terry Dale Tilmon ("Plaintiff"), a prisoner at Madison Correctional Center ("MCC"),[2] proceeding pro se and in forma pauperis, filed this proceeding on November 22, 2021, under 42 U.S.C. § 1983. Plaintiff claims that he was "subjected to extreme levels of environmental tobacco and synthetic marijuana smoke." [doc. # 1, p. 5]. He alleges:

> 9. Although the facility has in place non-smoking policies, such policies are not enforced due to inadequate staffing to enforce said policy.

> 10. Moreover, tobacco products are sold in the facility's commissary. (e-Cigarettes).

> 11. [T]he facility does not offer non-smoking housing units for non-smokers who desire to avoid breathing second-hand smoke.

> 12. Smoke in housing dormitories [is] so prevailing that such smoke appears like fog on occasions and even has stained the walls of his living area.

> 13. It is not uncommon that employees complain about the odor and density of tobacco and synthetic marijuana.

> 14. Huge amounts of tobacco and synthetic marijuana are smuggled into the facility daily due to inadequate staffing.

> 15. [T]he UPDCC is aware of the dangers of second-hand smoke as [Plaintiff] regularly experiences headaches, coughing, sneezing, rises in blood pressure ([Plaintiff] suffers from hypertension) loss of appetite, [and] sleeplessness.

*Id.* at 5–6. Plaintiff also experienced "nose bleeds." [doc. # 12, p. 1].

Plaintiff states that "the conditions began on June 24, 2019," and ended October 22, 2021, when he transferred to RPDC. *Id.* at 2, 5. He faults the UPDCC Chairman for failing to enforce non-smoking policies and failing to prevent the introduction of tobacco and synthetic 4 marijuana.

---

[2] Plaintiff advised the Court on October 21, 2022, that he was transferred from Franklin Parish Detention Center ("FPDC") to MCC. [doc. #43]. In his motion for copies [doc. #94], Plaintiff indicated that he was granted parole on May 25, 2023, and expected to be released by June 1, 2023. *Id.* at 1.

*Id.* at 2.  He also faults the UPPJ, Warden Adams, and the UPDCC. [doc. #s 1, p. 14; 12, pp. 3, 5, 6].

Plaintiff claims that he was unable to practice his religion because of the environmental marijuana smoke.  [doc. # 1, p. 6].  The smoke caused him to experience a "euphoric state of mind[,]" and "he is not to perform prayer in such a state of mind" under his Islamic faith.  The "presence of synthetic marijuana smoke in dormitory housing substantially burdens his ability to practice his religious beliefs" because he has "had to abandon numerous prayers . . . ." *Id.*  He must pray five times each day, but he was unable to do so at least three times each day due to the synthetic marijuana smoke.  [doc. # 12, p. 2].  He writes: "There is no alternative to prayer." *Id.*

Plaintiff claims that the UPDC was infested with cockroaches, bed bugs, and gnats.  [doc. # 1, p. 8].  The "presence of vermin [did] not abate" throughout his "entire stay at UPDC[.]" *Id.*  He alleges that "the presence of vermin without effective pest control services has the potential to cause disease . . . ." *Id.*

Plaintiff claims that all housing areas were "infested with black mold and mildew . . . ." [doc. # 1, p. 9].  Ventilation filters were clogged with inches of dust, impeding air flow and the ability to vent synthetic marijuana smoke.  *Id.* at 9-10.  Lighting fixtures were "soiled with thick dust . . . ." *Id.* at 10.

On November 22, 2020, in "'M' dormitory[,]" Plaintiff slipped and fell on a "puddle of water that collected on the floor beneath and around the water fountain."  [doc. # 1, p. 11].  He claims that the water fountain was faulty because its stream extended beyond the basin.  *Id.*  He experienced numbness in his fingers, limited movement in his left arm, and pain in his left shoulder, hip, neck, and "cervical area[.]"  *Id.*  He alleges that "there were no wet floor signs

warning of the floor's condition." *Id.* Plaintiff and "others have reported the condition of the water fountain to maintenance, correction officers, and the warden to no avail." *Id.*

Plaintiff claims that Warden Adams fired him from his position at the UPDC law library and transferred him to RPDC because Plaintiff showed him a grievance and a copy of his initial pleading in this proceeding. [doc. # 12, p. 5].

Plaintiff seeks nominal, compensatory, and punitive damages.

On April 14, 2022, upon the undersigned's initial review, the Court dismissed ten of Plaintiff's claims. [doc. #16]. Eight claims remained, including two against Secretary LeBlanc: a Section 1983 claim alleging that Plaintiff was exposed to unreasonably high levels of e-cigarette and marijuana smoke and a condition-of-confinement claim concerning the presence of insects; rust; peeling paint; mold; mildew; dust; lack of ventilation; and wet floors at UPDC. [doc. #13, pp. 1–2]. All other claims against Secretary LeBlanc were dismissed. *Id.*

On October 28, 2022, Secretary LeBlanc filed a motion to dismiss. [doc. #45]. On December 27, 2022, the undersigned recommended that Secretary LeBlanc's motion be granted. [doc. #61]. On January 17, 2023, Judge Doughty adopted the undersigned's recommendation and dismissed Plaintiff's claims against Secretary LeBlanc. [doc. #69].

On February 16, 2023, Defendants filed the instant motion for summary judgment. [doc. #81]. Therein, Defendants argue that there are no genuine issues as to any material fact, and they are entitled to judgment as a matter of law. [doc. #81-1, p. 7]. Accordingly, Defendants seek dismissal of all of Plaintiff's claims against them. *Id.*

On April 17, 2023, Plaintiff filed his opposition to Defendants' motion for summary judgment. [doc. #86]. Therein, he argues that there are genuine issues of material facts that create factual disputes for trial. *Id.* at 1. Accordingly, he asks that Defendants' motion be denied. *Id.*

On April 24, 2023, Defendants filed their reply brief in support of their motion for summary judgment.  [doc. #89].

On May 5, 2023, Plaintiff filed a motion for leave to file documents.  [doc. #90].  On May 10, 2023, the undersigned granted Plaintiff's motion, allowing him to file his exhibits and declaration as supplements to his opposition to Defendants' motion for summary judgment.  [doc. #91].  On May 17, 2023, consistent with the undersigned's order, Defendants filed a supplemental reply in support of their motion for summary judgment.  [doc. #93].

On June 1, 2023, Plaintiff filed a motion styled as a "motion for copies" [doc. #94], wherein he seeks to re-open discovery.  On June 6, 2023, Defendants filed their opposition.  [doc. #95].

Accordingly, briefing is complete.  This matter is ripe.

## Discussion

I.    *Summary Judgment Standard*

Summary judgment is appropriate when the evidence before the Court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.  *Id.*

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine dispute of material fact by pointing out that the record contains no support for the non-moving party's claim.  *Stahl v. Novartis Pharm. Corp.*,

283 F.3d 254, 263 (5th Cir. 2002) (quoting Fed. R. Civ. P. 56(c)). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.* "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).[3]

In evaluating a motion for summary judgment, courts "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Total E & P USA Inc. v. Kerr-McGee Oil & Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013). While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that a genuine dispute of material fact exists. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). "'If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate." *Cutting Underwater Tech. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) (quoting *Anderson*, 477 U.S. at 248).

II.    *Defendants' Motion for Summary Judgment*

Defendants seek summary judgment on all of Plaintiff's remaining claims:

(a) that Chairman Gates, Warden Adams, the UPDCC, and the UPPJ exposed Plaintiff to unreasonably high levels of e-cigarette and marijuana smoke in violation of the Eighth Amendment;

(b) that the UPDCC and the UPPJ negligently exposed Plaintiff to environmental tobacco smoke by failing to adequately staff UPDC;

---

[3] However, Rule 56 does not require the Court to "sift through the record in search of evidence to support a party's opposition to summary judgment." *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).

(c) that Chairman Gates, Warden Adams, the UPDCC, and the UPPJ's failure to properly staff UPDC caused exposure to "extreme levels of synthetic marijuana smoke," which prevented Plaintiff from practicing his religion;

(d) that Defendants' failure to properly staff UPDC caused exposure to "extreme levels of synthetic marijuana smoke," which violated the Religious Land Use and Institutionalized Persons Act;

(e) Conditions-of-confinement claims—against UPDCC, UPPJ, and Chairman Gates concerning the presence of insects, rust, peeling paint, mold, mildew, dust, lack of ventilation, and wet floors;

(f) Negligence claims that the UPDCC and the UPPJ breached their duty to control the insects in UPDC;

(g) Slip-and-fall claim against UPDCC, Chairman Gates, UPPJ, and Warden Adams;

(h) Retaliation against Warden Adams.

The Court will consider each claim.

### A. Plaintiff's Eighth Amendment excessive smoke claims should be dismissed.

Plaintiff asserts the following Eighth Amendment excessive smoke claims: (1) excessive tobacco smoke ("ETS") claims against Warden Adams and Chairman Gates in their official capacities; (2) ETS claims against Warden Adams and Chairman Gates in their individual capacities; (3) excessive e-cigarette vapor claims against Warden Adams and Chairman Gates in their individual capacities; and (4) municipal liability claims against the UPPJ and the UPDCC for unreasonable exposure to second-hand smoke. Specifically, Plaintiff alleges that he was exposed to unreasonably high levels of second-hand smoke from tobacco, synthetic marijuana, and e-cigarettes, in violation of the Eighth Amendment.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. CONST. AMEND. VIII. The Supreme Court has applied a two-prong test to determine whether exposure to second-hand smoke violates a prisoner's Eighth Amendment rights. *Wesley v.*

*LeBlanc*, No. 1:20-cv-00243, 2021 WL 1219982 at *4 (W.D. La. March 15, 2021) (citing *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).  First, a prisoner must show, objectively, that he is being exposed to unreasonably high levels of environmental smoke.  *Id.; see also Gipson v. Keith*, No. 1:14-cv-02278, 2018 WL 1512969, at *1 (W.D. La. Mar. 2, 2018) (applying *Helling* test to non-tobacco smoke, including marijuana smoke).

Second, a prisoner must show, subjectively, that the prison authorities were deliberately indifferent to his plight.  *Id.*  Deliberate indifference is "an extremely high standard to meet." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).  An official is deliberately indifferent when he "knows of and disregards an excessive risk to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  He must both "know that [the inmate] faces a substantial risk of serious bodily harm" and "disregard that risk by failing to take reasonable measures to abate it." *Gobert*, 463 F.3d at 346 (quoting *Farmer*, 511 U.S. at 847).

The Court will determine whether genuine disputes of material fact exist as to each element of *Helling*, for each claim.

> 1. *Plaintiff's official capacity claims against Warden Adams and Chairman Gates are duplicative and should be dismissed.*

"A judgment in a § 1983 lawsuit against an official in his official capacity imposes liability against the entity he represents."  *Broussard v. Lafayette City-Par. Consol. Gov't*, 45 F. Supp. 3d 553, 571 (W.D. La. Sept. 5, 2014).  Here, Plaintiff's claims against Warden Adams and Chairman Gates in their official capacities are identical to the claims he brings against the UPPJ and UPDCC. Accordingly, Plaintiff's claims against Warden Adams and Chairman Gates in their official capacity are redundant and should be dismissed.  *See Ferguson v. Gates*, 602 F. Supp. 3d 942, 950 (W.D. La. May 12, 2022) (quoted source omitted); *Lehman v. Guinn*, Civ. Action No. 20-0736, 2021 WL 935887, at *10 (W.D. La. Feb. 9, 2021), *R&R adopted,* 2021 WL 929885 (W.D. La.

Mar. 10, 2021); *Faul v. Fontenot*, Civ. Action No. 19-1221, 2020 WL 4929358, at *3 (W.D. La. Aug. 4, 2020), *R&R adopted,* 2020 WL 4929323 (W.D. La. Aug. 21, 2020).

> 2. *Warden Adams and Chairman Gates were not deliberately indifferent to the serious risk of harm to Plaintiff from exposure to tobacco and synthetic marijuana smoke.*

Supervisory officials, like Warden Adams and Chairman Gates, are individually liable under § 1983 only when they are "shown to have been personally and directly involved in conduct causing an alleged deprivation of an inmate's constitutional rights" or there is "some causal connection between the actions of the official and the constitutional violation sought to be addressed." *Kyles v. LeBlanc*, No. 16-0399-SDD-EWD, 2017 WL 4080474, at *4 (M.D. La. Aug. 10, 2017) (citing *Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983)). Allegations that an official is responsible for the actions of subordinate officers or co-employees under a theory of vicarious liability or respondeat superior are, alone, insufficient to state a claim under Section 1983. *Id.* (citing *Ashcroft*, 556 U.S. at 676; *Monnell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978); *Bell v. Livingston*, 356 F. App'x 715, 716–17 (5th Cir. 2009)).

The Court will consider Plaintiff's ETS claims against Warden Adams and Chairman Gates individually.

> i. *Warden Adams*

Defendants argue that Plaintiff fails to prove Adams's deliberate indifference—the second prong of *Helling*.[4] [doc. #81-1, p. 12]. "In evaluating deliberate indifference to [environmental

---

[4] Defendants do not appear to challenge that Plaintiff has satisfied the objective prong of the *Helling* test as to his ETS claim. Indeed, it is well established that ETS is dangerous. Courts in the Western District of Louisiana regularly take judicial notice of the Surgeon General's 2006 report "The Health Consequences of Involuntary Exposure to Tobacco Smoke." *Dardar v. LeBlanc*, No. 1:21-cv-02284, 2023 WL 2484475, at *1 n. 1 (W.D. La. Feb. 23, 2023), *R&R adopted*, 2023 WL 2480844 (W.D. La. Mar. 13, 2023).

tobacco smoke], the following factors should be considered: the adoption of a smoking policy; the administration of that policy; and the realities of prison administration." *Callicutt v. Anderson*, 48 F. App'x 916 (5th Cir. 2002) (citing *Helling*, 509 U.S. at 36–37).

The undersigned agrees that Plaintiff fails to establish that Warden Adams was deliberately indifferent. It is undisputed that, throughout Plaintiff's incarceration at UPDC, UPDC maintained a no-smoking policy. Warden Adams testified that inmates at UPDC are provided an Offender Orientation Handbook, which expressly prohibits the use of tobacco, drugs, and smoking. [doc. #81-5]. And Plaintiff agrees: he testified that UPDC maintained a policy prohibiting marijuana and synthetic marijuana as well as tobacco smoke. [doc. #81-3, pp. 101, 122].

Rather, Plaintiff argues that Warden Adams failed to enforce the no-smoking policy. [doc. #86, p. 12]. He claims that UPDC was understaffed and that employees regularly turned a blind eye to smoking. *Id.* He provides an affidavit from Melissa Morrow, a former employee at UPDC, who testified that UPDC is "normally short of staff" which makes it "difficult to enforce the rules such as the introduction of contraband." [doc. #86-1, p. 41]. Morrow further testified that she commonly smelled "cigarette smoke" and smoke from synthetic marijuana called "mojo." *Id.* at 40. Plaintiff also provided an affidavit from Danny Rubin, a former inmate at UPDC who testified that "there was so much smoking that our dormitory appeared as a bar room." [doc. #86-1, p. 45].

Nonetheless, Plaintiff testified that Warden Adams acted to prevent smoking at UPDC, including: (1) moving inmates from certain dormitories to stop the passing of contraband [doc. #81-3 pp. 81–82]; (2) warning inmates that he would remove luxuries if he smelled cigarettes or marijuana [doc. #81-3, pp. 85, 102]; (3) writing up inmates caught under the influence of synthetic marijuana [doc. #81-3, p. 102]; and (4) warning inmates as to the health risks associated with smoke (characterized by Plaintiff as "preaching") [doc. #81-3, pp. 102, 103]. Rubin confirmed

10

this testimony in his affidavit, stating that whenever Warden Adams would smell cigarettes or mojo, he would threaten to take away privileges. [doc. #86-1, p. 45].

Warden Adams also testified in an affidavit that (1) he never permitted inmates to smoke tobacco, marijuana, or any other drug [doc. #81-5, p. 2]; (2) he has never allowed UPDC employees to permit inmates to smoke tobacco, marijuana, or any other drug [doc. #81-5, p. 3]; (3) inmates who violate UPDC's no-smoking policy receive discipline, including verbal counseling, removal of privileges, and disciplinary write-ups [doc. #81-5, p. 3]; and (4) he has taken affirmative steps to reduce the introduction, movement, and use of contraband at UPDC, including random dormitory searches, strip searches, drug testing, and movement of offenders from one dormitory to another [doc. #81-5, p. 14].

Given Plaintiff's own testimony that Warden Adams regularly took action to prevent inmates from smoking tobacco and synthetic marijuana in violation of UPDC's no-smoking policy, the undersigned finds that he has not raised a genuine dispute of material fact as to whether Warden Adams was deliberately indifferent. Defendants' uncontroverted evidence shows that Warden Adams took *some* measures to prevent exposure to second-hand smoke, even if those measures proved unsuccessful. *See Dardar*, 2023 WL 2484475, at *3 (no deliberate indifference where Defendants made efforts to stop inmates smoking); *see also Gipson v. LeBlanc*, Civ. No. 1:17-1394-P, 2022 WL 37315, at *3 (W.D. La. Jan. 3, 2022) (no deliberate indifference where evidence showed Defendants took action to enforce no-smoking policy, including removing privileges and issuing disciplinary violations to those caught smoking). Additionally, Plaintiff fails to show deliberate indifference as to the staffing of UPDC. While Plaintiff and Defendants submit competing evidence as to whether UPDC was adequately staffed, Plaintiff provided no evidence that "additional staffing or funding was available" and Warden Adams failed to put it to use. *See*

*Humphrey v. Hall*, No. 22-60227, 2023 WL 2706830, at *1 (5th Cir. Mar. 29, 2023) (citing *Farmer*, 511 U.S. at 837, 844–45; *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)).  Indeed, if Adams' response to the presence of ETS at UPDC was "not perfect or adequate," or even negligent, there is no evidence showing that Warden Adams' conduct rises to the level of wanton disregard, as required to establish deliberate indifference.

The undersigned recognizes that Plaintiff submitted an affidavit on May 5, 2023, where he attempts to paint his earlier deposition testimony in a different light.  In his May 5 affidavit, Plaintiff states that he only *assumed* that Warden Adams moved inmates around to prevent the proliferation of drugs at UPDC.  [doc. #90-1, pp. 1–2].  He now recalls that inmates were moved to make room for pre-trial detainees.  *Id.*  He also states that, while Warden Adams would threaten to take away privileges from inmates he caught smoking, he never followed through and inmates "took his threats as bluffing."  *Id.*

The undersigned will not consider this affidavit contradicting his prior testimony.  The sham-affidavit rule provides that "a party may not manufacture a dispute of fact merely to defeat a motion for summary judgment."  *Hacienda Records, L.P. v. Ramos*, 718 F. App'x 223, 235 (5th Cir. 2019) (quoting *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 200 F.3d 380, 386 (5th Cir. 2000)) (internal quotation marks omitted).   The purpose of the rule is to prevent a party who has been examined at length on deposition from raising a fact dispute simply by submitting an affidavit contradicting his own prior testimony—which is exactly what Plaintiff attempts here.  *Id.* Inconsistencies abound between Plaintiff's earlier deposition and his subsequent affidavit; as noted above, Plaintiff-the-deponent testified that Warden Adams moved inmates between units, warned inmates about the danger of smoking, wrote-up inmates that smoked, and threatened to revoke privileges including microwaves and televisions.  [doc. #81-3].  Plaintiff-the-affiant, on the other

12

hand, stated that inmates were moved to make room for pre-trial detainees, and inmates never took Adams' threats seriously.  [doc. #90-1, pp. 1–2].  Plaintiff-the-affiant provides no reasonable explanation for why he was unable to properly recall these events during his earlier deposition but can now recall them after reviewing Defendants' motion for summary judgment.  Thus, he cannot use the May 5, 2023, affidavit to impeach his earlier, sworn testimony.  *See Hacienda*, 718 F. App'x at 235 (quoting *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996)) (internal quotation marks omitted).

The undersigned also notes that, even if Plaintiff's sham affidavit was proper summary judgment evidence, it fails to controvert Defendants' evidence establishing that Warden Adams took some action to enforce UPDC's no-smoking policy.  Plaintiff explains in the affidavit that Warden Adams must have known about synthetic marijuana smoke at UPDC because he punished an inmate who was discovered under the influence.  [doc. #90-1, p. 3].  Thus, Plaintiff admits that Warden Adams acted to enforce the no-smoking policy.

In sum, Plaintiff fails to show that any genuine dispute of material fact exists as to whether Warden Adams was deliberately indifferent to Plaintiff's exposure to environmental tobacco and synthetic marijuana smoke.  Accordingly, Warden Adams is entitled to summary judgment,  and the § 1983 claim against him in his individual capacity should be dismissed.

### ii.    *Chairman Gates*

Defendants also argue that Plaintiff fails to prove Chairman Gates's deliberate indifference. [doc. #81-1, pp. 15–16].  According to Defendants, Chairman Gates does not participate in UPDC's daily operations; consequently, he could not have been deliberately indifferent to Plaintiff's alleged unreasonable exposure to second-hand smoke.  [doc. #81-5, p. 2].

13

The undersigned agrees.  In his deposition, Plaintiff testified that he "believed that [Chairman Gates] knew" about drug use and smoke exposure at UPDC [doc. #81-3, pp. 111] but later admitted that he "can't say for sure."  *Id.* at 128, 129. Plaintiff also admitted that he has "[n]ever seen" Chairman Gates "in his life" and has "never seen [Chairman Gates] at [UPDC]." *Id.* at 110.  Furthermore, Plaintiff does not offer any summary judgment evidence that Chairman Gates was "personally and directly involved in conduct" causing a violation of his Eighth Amendment rights.  *See Kyles*, 2017 WL 4080474, at *4.

Therefore, Plaintiff fails to show any genuine dispute of material fact as to whether Chairman Gates was deliberately indifferent to Plaintiff's exposure to environmental tobacco and synthetic marijuana smoke.  Accordingly, Chairman Gates is entitled to summary judgment, and this claim should be dismissed.

### 3.  *Plaintiff does not show that he was exposed to unreasonably high levels of e-cigarette vapor.*

Plaintiff argues that Warden Adams and Chairman Gates are liable for unreasonably exposing him to e-cigarette vapor.  Excessive e-cigarette vapor claims are also subject to the *Helling* test.  *See Bonilla v. Cobb*, No. 19-1028, 2019 WL 6592593, at *6–7 (W.D. La. Nov. 18, 2019), *R&R adopted by* 2019 WL 6598408 (W.D. La. Dec. 4, 2019) (applying Helling standard to claim involving e-cigarette vapor).  Thus, Plaintiff must show that, objectively, he was exposed to unreasonably high levels of e-cigarette vapor; and that, subjectively, Warden Adams and Chairman Gates were deliberately indifferent.  *See Helling*, 509 U.S. at 35.  Defendants argue that Plaintiff does not make either showing.

Turning to the objective factor, "the court must conduct an inquiry into the seriousness of the potential harm and into the likelihood that second-hand smoke will actually cause such harm." *Richardson v. Spurlock*, 260 F.3d 495, 498 (5th Cir. 2001).  Plaintiff contends that he was

"intentionally exposed to chemicals that emanate from e-cigarette vapors." [doc. #86, p. 7]. He further argues that Defendants' admission that UPDC sells e-cigarettes and allows inmates to utilize them in their housing areas is sufficient to satisfy the objective prong of *Helling*. *Id.* at 8.

The undersigned disagrees. While exposure may be dangerous, Plaintiff does not provide sufficient evidence to controvert Defendants' showing that exposure to e-cigarette vapor does not reflect an *extreme* health deprivation. Defendants provide an affidavit from Luanne Trahant, a Registered Nurse and Board-Certified Family Nurse Practitioner, who states that "[b]ecause e-cigarettes are still so new, and because the science pertaining to e-cigarettes is still emerging, at present, whether there are any health consequences of being exposed to second-hand e-cigarette vapor is still unknown." [doc. #81-7, p. 2]. Plaintiff's own evidence suggests the same: the 2016 Surgeon General Report that Plaintiff cites states that "the health impacts of frequent exposure to the toxicants in e-cigarette aerosol are not well understood, although several are known carcinogens." [doc. #86-1, p. 5].

Thus, the risk Plaintiff describes is not "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *See Helling*, 509 U.S. at 35. Therefore, Plaintiff fails to raise a genuine dispute of material fact as to whether he satisfies the objective prong of *Helling*, and the Court need not reach the subjective prong. Accordingly, Defendants are entitled to summary judgment, and these claims should be dismissed.

> 4. *Defendants are entitled to summary judgment on Plaintiff's § 1983 municipal liability claims.*

To establish municipal liability under § 1983, a plaintiff must prove that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009); *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691–94 (1978).

15

"A municipality is almost never liable for an isolated unconstitutional act on the part of an employee; it is liable only for acts directly attributable to it through some official action or imprimatur." *Peterson*, 588 F.3d 838 at 847 (internal quotations omitted).  Further, municipalities are not liable under § 1983 on the theory of *respondeat superior*.  *Id.*; *O'Quinn v. Manuel*, 773 F.2d 605, 608 (5th Cir. 1985).  The official policy requirement may be met in various ways, including written policy statements, regulations, ordinances, or "widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009) (citations and internal quotations omitted).  Commonly, a plaintiff may establish the existence of a custom or policy is by demonstrating (1) a pattern of unconstitutional conduct by municipal actors or employees; or (2) a single unconstitutional act by a final policymaker.  *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010).

However, even if Plaintiff could otherwise meet his burden, there can be no municipal liability without a constitutional violation.  In this case, Plaintiff has failed to establish that a constitutional violation on his excessive smoke claims or his e-cigarette vapor claims.  Therefore, Defendants are entitled to summary judgment, and Plaintiff's municipal liability claims should be dismissed.

> B. *Plaintiff's claims that extreme levels of synthetic marijuana smoke prevented him from practicing his religion should be dismissed.*

Plaintiff also alleges that Defendants violated his right to freely exercise his religious beliefs.  [doc. #12, p. 2].  Specifically, Plaintiff argues that "by policy, practice, and customs maintained at UPDC [sic] created by the UPDCC i.e.[,] understaffing resulting in the introduction of contraband namely synthetic marijuana AKA [sic] mojo substantially burdened [Plaintiff's] ability to practice a central component of his religious beliefs i.e., prayer."  [doc. #86, p. 15–16].

16

"The First Amendment to the United States Constitution is violated when prisoners are not afforded 'reasonable opportunity' to exercise their religious beliefs." *Davis v. Davis*, 826 F.3d 258, 265 (5th Cir. 2016) (quoting *Cruz v. Beto*, 405 U.S. 319, 322 (1972)). "The First Amendment applies to State prisons by virtue of the Fourteenth Amendment." *Id.*

Prison officials may place reasonable limits on inmates' religious rights. *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 107 (1987)). Prison regulations that impinge on inmates' constitutional rights are valid so long as they are reasonably related to legitimate penological interests. *Id.* Courts considers four factors to determine the reasonableness of a regulation: "(1) the existence of a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) the existence of alternative means of exercising the right that remain open to prison inmates; (3) the impact an accommodation will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of alternatives." *Id.* (quoting *Turner*, 482 U.S. at 89–91).

The crux of Plaintiff's argument is that Warden Adams and Chairman Gates failed to adequately staff UPDC, and, therefore, there were not enough employees to enforce the facility's no-smoking policy. And because the no-smoking policy was ill-enforced, synthetic marijuana smoke was ubiquitous in the dormitories, causing Plaintiff to fall under the influence of synthetic marijuana smoke, which interfered with his ability to pray with a clear mind and caused him to abandon numerous prayers. [doc. #1, p. 6]. This, Plaintiff says, violated his First Amendment rights.

As an initial matter, the Fifth Circuit has held that "staff and space limitations, as well as financial burdens, are valid penological interests." *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 861 (5th Cir. 2004) (citing *Ganther v. Ingle*, 75 F.3d 207, 211 (5th Cir. 1996)). "Prison

17

administrators, like most government officials, have limited resources to provide the services they are called to administer." *Id.* (quoting *Al-Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir. 1991)) (internal quotation marks omitted).

Furthermore, Defendants provide summary judgment evidence establishing that Plaintiff had adequate alternatives to complete his prayers. For example, Plaintiff testified that he could have prayed in the law library or shortened or combined his prayers. [doc. #81-3, pp. 144–145]. Plaintiff acknowledged that he "wouldn't have a problem adjusting [his prayer schedule]," but questioned why he should be forced to do so simply because Defendants were not adequately enforcing UPDC's no-smoking policy. *Id.* at 147.

Plaintiff does not contravene this evidence; rather, he argues in his opposition brief that the law library is only open from 9:30 a.m. until 2:30 p.m., meaning that he could not complete all his required prayers in the law library each day. [doc. #86, p. 16]. Plaintiff testified, however, that he could complete some prayers in the law library and then combine or shorten other prayers, allowing him to complete his required prayers under sound mind. [doc. #81-3, pp. 144–145]. The undersigned acknowledges that the Parties have submitted competing evidence as to whether UPDC is adequately staffed; however, even viewing this evidence in the light most favorable to Plaintiff, his claims still fail. The uncontroverted summary judgment evidence establishes that Plaintiff has alternative means of exercising his First Amendment rights by praying in the law library and combining other prayers so that he can complete prayers free of synthetic marijuana smoke. *See DeMarco v. Bynum*, 50 F.4th 479, 483 (5th Cir. 2022) (affirming grant of summary judgment where, among other factors, plaintiff had alternative means of exercising his First Amendment rights).

Therefore, Plaintiff fails to raise a genuine dispute of material fact as to whether Adams, Chairman Gates, the UPDCC, or the UPPJ violated his First Amendment rights. Accordingly, Defendants are entitled to summary judgment, and Plaintiff's free exercise claims should be dismissed.

> *C. Plaintiff's claim that his exposure to extreme levels of marijuana smoke violated RLUIPA should be dismissed.*

Plaintiff next alleges that the presence of synthetic marijuana smoke substantially burdened his ability to exercise his religious beliefs in violation of the Religious Land Use of Institutionalized Persons Act ("RLUIPA"). [doc. #1, p. 13].

RLUIPA "imposes a higher burden than does the First Amendment in that the statute requires prison regulators to put forth a stronger justification for regulations that impinge on the religious practices of prison inmates." *Id.* "RLUIPA provides that 'no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if that burden results from a rule of general applicability," unless the burden "is in furtherance of a compelling government interest" and "is the least restrictive means of furthering that compelling government interest." *Chance v. Tex. Dep't of Crim. Justice*, 730 F.3d 404, 410 (5th Cir. 2014) (quoting 42 U.S.C. § 2000cc–1(a)). Thus, the Court must determine whether the challenged government action "substantially burdens" the plaintiff's "religious exercise." *Mayfield v. Tex. Dep't of Crim. Justices*, 529 F.3d 599, 612 (5th Cir. 2008). This requires two assessments: (1) whether the burdened activity is "religious exercise" and (2) whether the burden is "substantial." *Id.* (quoting *Adkins v. Kaspar*, 393 F.3d 559, 565 (5th Cir. 2014)). Here, Defendants do not contest Plaintiff's allegedly burdened activity is religious exercise; therefore, the Court must analyze whether the alleged burden is "substantial." *See id.*

While RLUIPA does not define what constitutes a "substantial burden," the Fifth Circuit has provided a definition:

> [A] government action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs .... [T]he effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs.

*Id.* (quoting *Adkins*, 393 F.3d at 570).

The "substantial burden" analysis is a "case-by-case, fact-specific inquiry. *Id.* "If the prisoner presents prima facie evidence of a substantial burden, the government is required to demonstrate that its action was supported by a compelling interest and that the regulation is the least restrictive means of carrying out that interest." *Id.*

Applying RLUIPA's higher burden (compared to First Amendment claims), Plaintiff does not show that any failure to adequately staff UPDC imposes a "substantial burden" such that he must significantly modify his behavior *and* significantly violate his religious beliefs. As discussed above, there is a fact dispute as to whether UPDC had an adequate number of staff to enforce the no-smoking policy. However, even if inadequate staffing resulted in his exposure to marijuana smoke and caused him to modify his behavior, he does not show that the modification significantly violated his religious beliefs. In his opposition brief, Plaintiff contends that inmates begin smoking synthetic marijuana between 4 p.m. and 5 p.m. and continue until late in the night, disrupting Plaintiff's ability to complete his third, fourth, and fifth daily prayers, which he says he had to "abandon." [doc. #86, p. 16]. However, Plaintiff testified during discovery that he could complete some prayers in the law library and then combine or shorten other prayers, allowing him to

complete his required prayers under sound mind.  [doc. #81-3, pp. 144–145].  He also testified

that, while undesirable, combining prayers would fulfill the requirements of his faith:

> You know, the combination of prayers . . . is okay, you know, to do it but it's what
> you call mock rule. It mean [sic] that it's undesirable to basically combined prayers.
> The combination of prayers, the only thing that I can see where you are going at is
> that well, could you had a prayed [sic] that morning all the prayers that you missed
> previously or whatever.  The prayers have to be done at a certain . . . time . . . which
> we say that the [C]reator had basically ordained that we do them.  And for me to
> take and try to combine all prayers in one prayer 5:00 in the morning, that I'm going
> to try to combine the other three prayers is basically not insignificant[,] but I don't
> think it . . . undesirable to . . . you would want to do it . . . basically on time because
> if it wasn't for the activity that was going on I could do it on time but for the basic
> not being able to enforce your policies or whatever.  **And so, I would have no
> problem trying to readjust, you know, in order to fulfill my religious belief or,
> you know, adjusting . . . my practice or whatever.  I wouldn't have a problem
> adjusting it, but why should I have to when you're not doing your job and
> anywhere else that I had been previously to that I didn't have to do that.**

[doc. #147, pp. 240–241] (emphasis added).

Thus, while Plaintiff may be forced to modify his behavior by combining prayers at certain

times of day where inmates are not smoking marijuana, he testified doing so would fulfill his

religious beliefs.   Indeed, the availability of alternative means of exercising the burdened activity

lessens the relative burden imposed by the UPDJ.  *C.f. Mayfield*, 529 F.3d at 614–15 (finding that

the inability of Plaintiff to exercise alternative means of worship increased the relative burden

imposed by the Defendant's policy).  On Plaintiff's facts, he is forced to alter his prayer schedule

to complete his third, fourth, and fifth daily prayers before 4 p.m., instead of at their appointed

time.  While the undersigned is sympathetic to Plaintiff's argument that he should not be forced to

disrupt his prayer schedule due to the UPDC's inability to enforce its own policy, there is simply

not summary judgment evidence showing that the alleged disruption to Plaintiff's prayer schedule

rises to the level of a "substantial burden" to the exercise of his religious belief.

Additionally, Plaintiff is not being denied a generally available benefit because of his religious beliefs. Assuming Plaintiff's factual allegations are true, *all* inmates, regardless of their religious beliefs, are exposed to synthetic marijuana smoke. *C.f. Moussazadeh v. Tex. Dep't of Crim. Justice*, 703 F.3d 781, 794 (5th Cir. 2012) (exercise of religious beliefs substantially burdened where Muslim inmate had to pay for halal meals, but Jewish inmates received kosher meals free of charge).

Furthermore, "[w]hen deciding a motion for summary judgment prior to a bench trial, the district court has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (quoting *Johnson v. Diversicare Afton Oaks, LLC*, 597 F.3d 673, 676 (5th Cir. 2010)). In a non-jury,[5] pro se prisoner complaint, the undersigned magistrate judge ordinarily is the trier of fact at a hearing held pursuant to *Flowers v. Phelps*, 956 F.2d 488 (5th Cir.), *modified on other grounds*, 964 F.2d 400 (5th Cir.1992), which "amounts to a bench trial replete with credibility determinations and findings of fact." *McAfee v. Martin*, 63 F.3d 436, 437 (5th Cir. 1995). In exercising that discretion here, the undersigned observes that, at best, Plaintiff provides mixed evidence as to whether the exercise of his religion is "substantially burdened." *See McFaul v. Valenzuela*, 684 F.3d 564, 577 (5th Cir. 2012) (affirming dismissal of RLUIPA claims where the plaintiff provided, at best, mixed evidence). If the same evidence presented by both Parties on summary judgment was presented at a *Flowers* hearing, the same result would inevitably follow.

---

[5] In the civil cover sheet accompanying his complaint [doc. #1-1], Plaintiff checked "no" jury demand.

Accordingly, Defendants are entitled to summary judgment and Plaintiff's RLUIPA claims should be dismissed.

### D.  Plaintiff's conditions-of-confinement claims should be dismissed.

Plaintiff alleges that the conditions at UPDC violated his Eighth Amendment right to be free from cruel of unusual punishment.  The Eighth Amendment "does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer*, 511 U.S. at 832.  "The Constitution requires that inmates receive adequate food, clothing, shelter, medical care, and mental health care, and that detention facilities 'take reasonable measures to ensure the safety of the inmates.'" *Jones v. Gusman*, 296 F.R.D. 416, 430–31 (E.D. La. June 6, 2013) (quoting *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004)).  An Eighth Amendment claim based on the conditions of an inmate's confinement requires a plaintiff to show conditions that "pos[e] a substantial risk of serious harm" and that "defendant prison officials were deliberately indifferent to the inmate's health or safety." *Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015) (quoting *Farmer*, 511 U.S. at 834) (internal quotation marks omitted).

Specifically, Plaintiff claims that the UPDC was infested with cockroaches, bed bugs, and gnats.  [doc. #1, p. 8].  The "presence of vermin [did] not abate" throughout his "entire stay at UPDC[.]" *Id.*  He alleges that "the presence of vermin without effective pest control services has the potential to cause disease . . . ." *Id.*  The insects crawled on him at night, making it impossible to sleep. *Id.*  He suggests that bed bugs bit him, leaving "red sore blister like marks that last[ed] for days at a time." *Id.*  He endured mental anguish, "pain from insect bites, sleeplessness, and fear of contracting disease . . . ." *Id.* at 15.

While the undersigned is sympathetic to Plaintiff's discomfort, "the mere presence of pests, such as gnats . . . does not amount to a constitutional violation." *Smith v. Gusman*, No. 14-1154-

DEK, 2015 WL 2066517, at *2 (E.D. La. May 4, 2015) (citing *Simmons v. Gusman*, No. 13-1907, 2015 WL 151113, at *4 (E.D. La. Jan. 12, 2015); *Clark v. Gusman*, Civ. No. 11-2673, 2012 WL 1825306, at *5 (E.D. La. Mar. 29, 2012), *R&R adopted*, 2012 WL 1825302 (E.D. La. May 18, 2012); *Murray v. Edwards County Sheriff's Dep't*, 453 F. Supp. 2d 1280, 1292 (D. Kan. Sept. 26, 2006)).

Plaintiff also alleges, "[d]ue to faulty plumbing the housing areas are always wet with water on the floor adjacent to the restroom due to leaking pipes." *Id.* Plaintiff claims that all "housing area[s] are infested with black mold and mildew . . . ." *Id.* at 9. "Ventilation filters are clogged with dust that appears to be three inches thick making it difficult for adequate flow of air." *Id.* The lack of ventilation created "foggy conditions" due to tobacco and synthetic marijuana smoke. *Id.* Plaintiff adds that the facility had rust and peeling paint. [doc. #s 1, p. 13; 12, p. 1].

Again, while the undersigned is sympathetic to Plaintiff's complaints, they do not rise to a violation of his constitutional rights. "While . . . plumbing problems are undoubtedly annoying, they are not actionable under federal law . . . ." *Smith*, 2015 WL 2066517, at *3 (citing *Holloway v. Gunnell*, 685 F.2d 150, 156 (5th Cir. 1982)). Furthermore, "leaks, while unpleasant, are not unconstitutional." *Id.* (quoting *Bean v. Pittman*, Civ. No. 14-2210, 2015 WL 350284, at *4 (E.D. La. Jan. 26, 2015)) (internal quotation marks omitted). And rust and mold, though also unpleasant, do not render an inmate's confinement unconstitutional. *Id.* (citing *Eaton v. Magee,* Civ. Action No. 2:10–cv–112, 2012 WL 2459398, at *5 (S.D. Miss. June 27, 2012) ("Plaintiff's claim that the bathroom and shower area are unsanitary and contain black mold fails to rise to the level of a constitutional violation."); *Barnett v. Shaw,* No. 3:11–CV–0399, 2011 WL 2200610, at *2 (N.D. Tex. May 18, 2011) (allegation of "excessive amount of black mold in the showers and sinks" was insufficient to raise a claim for constitutional violation), *adopted,* 2011 WL 2214383 (N.D. Tex.

June 7, 2011); *Reynolds v. Newcomer,* Civ. Action No. 09–1077, 2010 WL 234896, at *10 (W.D. La. Jan. 19, 2010) (plaintiff's complaints of "the presence of black mold in living areas, eating areas, and shower areas" were found to "rise to no more than a *de minimis* level of imposition with which the Constitution is not concerned" (quotation marks omitted)); *McCarty v. McGee,* No. 2:06cv113, 2008 WL 341643, at *3 (S.D. Miss. Feb. 5, 2008) ("Plaintiff's claim that the shower he was forced to share with other inmates is polluted and covered in mold and fungus, causing him to catch athlete's foot and ringworm, fails to rise to the level of a constitutional violation.")); *see also Maddox v. Gusman*, Civ. Action No. 14–2435, 2015 WL 1274081, at *3 (E.D. La. Mar. 19, 2015) (presence of rust and mildew in a jail is not a constitutional violation); *Penn v. Jones*, Civ. Action No. 13–0830, 2014 WL 31351, at *2 (W.D. La. Jan. 2, 2014) (same).

Finally, the undersigned acknowledges that "[s]ome conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). That is not the case here. *C.f. Gates*, 376 F.3d at 338 (confinement in "extremely filthy" cells with crusted fecal matter, urine, peeling and chipping paint, dried ejaculate, and food particles on the walls was unconstitutional). While Plaintiff certainly alleges uncomfortable and even unsanitary conditions, they do not have the mutually enforcing effect of depriving him of food, warmth, or exercise. Therefore, even resolving any factual disputes in Plaintiff's favor, he does not establish a violation of his constitutional rights. Accordingly, Defendants are entitled to summary judgment and Plaintiff's conditions-of-confinement claims should be dismissed.

*E.  Plaintiff's retaliation claim against Warden Adams should be dismissed.*

Next, Defendants seek summary judgment as to Plaintiff's retaliation claim.  Plaintiff claims that Warden Adams fired him from his inmate counsel substitute position at UPDC library and transferred him to Richland Parish Detention Center because Plaintiff showed him a grievance and copy of his initial pleading in this proceeding.  [doc. #12, p. 5].

"Prison officials may not retaliate against prisoners for exercising their constitutional rights, including their First Amendment right to file grievances."  *Petzold v. Rostollan*, 946 F.3d 242, 252 (5th Cir. 2019) (quoting *Butts v. Martin*, 877 F.3d 571, 588 (5th Cir. 2017)) (internal quotation marks omitted).  However, a prisoner must overcome a "significant burden" to prevail on a retaliation claim.  *Id.* (citing *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995)). The prisoner must prove that "(1) he or she exercised a constitutional right to which (2) the official *intended* to retaliate against, and (3) the prisoner's constitutional exercise *caused* (4) the official to commit a retaliatory act that was more than de minimis."  *Id.*  "To prove intent and causation, the prisoner must at least establish a 'chronology of events from which retaliation may be plausibly inferred.'"  *Id.* (quoting *Butts*, 877 F.3d at 588–89).

Defendants argue that Plaintiff cannot prove the elements of a retaliation claim because he was never terminated from his job at the law library at UPDC.  In fact, according to Warden Adams' affidavit, Plaintiff maintained his job until he was transferred to RPDC on October 22, 2021, solely because Warden Adams suspected that Plaintiff was introducing drugs into the dormitory, through the law library.  [doc. #81-5, p. 4].  Plaintiff offers no evidence to controvert this narrative; he testified that he was informed on October 21, 2021, that he no longer worked in the law library and that he was transferred the next day.  [doc. #81-3, pp. 174–75].  Plaintiff offers

no evidence that he was *fired* from his position working in the law library.  Obviously, once transferred to RPDC, Plaintiff could no longer work in the UPDC law library.

With regard to his transfer, a prisoner has no constitutional right to incarceration in a particular institution.  *Olim v. Wakinekona*, 461 U.S. 238, 244–48 (1983); *Fuselier v. Mancuso*, 354 F. App'x 49 (5th Cir. 2009).  And even if Plaintiff's transfer was motivated by retaliatory intent, it is only actionable if Plaintiff produces summary judgment evidence that he was transferred to a more dangerous prison as a penalty for the exercise of his constitutional rights. *Smith v. Hebert*, 533 F. App'x 479, 482 (5th Cir. 2013) ("Absent [a showing that Plaintiff was transferred to a more dangerous prison], there is no indication that the transfer in question was actionable even if we assume that it was motivated by an intent to retaliate.").  In his opposition brief, Plaintiff alleges that RPDC is the "second most dangerous facility in the state."  However, without summary judgment evidence to support this assertion, this statement is merely speculative. Therefore, Plaintiffs, fails to raise a genuine dispute of material fact on his retaliation claim, and Defendants are entitled to summary judgment and the dismissal of this claim as well.

> F. *Plaintiff's claim—that UPDCC and UPPJ negligently exposed him to environmental tobacco smoke by failing to adequately staff the facility—survives.*

Next, Defendants seek summary judgment as to Plaintiff's state law negligence claim that UPDCC and UPPJ negligently exposed him to smoke by failing to adequately staff UPDC. Louisiana has adopted a "duty-risk" approach to negligence.  *Doe v. McKesson*, No. 17-30864, 2023 WL 4044558, at *7 (5th Cir. June 16, 2023).  "Under that approach, a plaintiff must prove five elements: (1) the plaintiff suffered an injury; (2) the defendant owed a duty of care to the plaintiff; (3) the duty was breached by the defendant; (4) the conduct in question was the cause-in-fact of the resulting harm; and (5) the risk of harm was within the scope of protection afforded by the duty breached."  *Id.* (internal citation omitted).

*1. Duty*

Defendants argue that Plaintiff does not show that UPDCC or UPPJ owed him a duty to properly staff UPDC because, statutorily, the superintendent is responsible for all day-to-day operations at UPDC.  Defendants cite LA. R.S. 15:850.7 which provides that "the day-to-day operations of the Union Parish Detention Center shall be conducted by a superintendent, corrections officer, and any other appropriate personnel, subject to the supervision and control of the commission."  Defendants also point to Adams' declaration, which states that "ensuring there is an adequate number of employees present at UPDC" is part of his responsibilities as Warden. [doc. #81-5, p. 2].

In opposition, Plaintiff argues that § 850.7 implies a duty of care to prisoners by providing that the superintendent's authority is "subject to the supervision and control of the commission." [doc. #86, p. 22].   Plaintiff also cites LA. R.S. 15:850.4, which provides that "The Union Parish Detention Center Commission shall have all other powers and duties of the sheriff or governing authority of a parish . . . provided by law for equipping, maintaining, operating, or supporting the public jail of a parish and the prisoners therein, which powers and duties include, but are not limited to . . . appointing and employing all necessary superintendents, corrections officers, and other appropriate personnel . . . ."  Thus, Plaintiff argues that Louisiana law imposes a duty on UPDCC to ensure that UPDC is adequately staffed.

"In Louisiana, prison authorities owe a duty of reasonable care to protect inmates from harm."  *Newsome-Goudeau v. Louisiana*, No. 17-909, 2020 WL 5665616, at *6 (W.D. La. Sept. 22, 2020) (citing *Chanthasalo v. Deshotel*, No. 2017-CA-0521 (La. App. 4 Cir. 12/27/17), 234 So. 3d 1103, 1107).  Undoubtedly, the Union Parish Detention Center Commission is a "prison authority"; Louisiana law explicitly provides that the superintendent's day-to-day operational

control of UPDC is subject to the "supervision and control" of the UPDCC. LA. R.S. 15:850.4–7. Thus, Plaintiff shows that, as a matter of law, UPDCC owed him a duty of reasonable care.

As to the UPPJ, while Louisiana law tasks each police jury with providing "a good and sufficient jail," the Police Jury has no responsibility over the daily operation of the jail. *See Bruce v. Little*, Civ. No. 1:11-cv-01541, 2016 WL 4533376, at *3 (W.D. La. July 25, 2016). Therefore, Plaintiff fails to show that UPPJ owed him any duty. Accordingly, the UPPJ is entitled to summary judgment and Plaintiff's negligence claim against it should be dismissed.

Having found a duty on the part of UPDCC, the Court will proceed analyze the other elements of his negligence claim.

### 2. Breach

Plaintiff must also show that UPDCC breached its duty of reasonable care by failing to adequately staff UPDC. Defendants argue there is no evidence of breach; Warden Adams was responsible for staffing, so responsibility for any failure to adequately staff UPDC lies with him rather than the UPDCC. [doc. #81-1, pp. 21–22]. They also argue that, even if UPDCC is responsible for adequate staffing, evidence shows that UPDC was adequately staffed at all times. *Id.*

The undersigned disagrees. Plaintiff provides summary judgment evidence that UPDC was understaffed. As discussed above, Melissa Morrow, a former employee at UPDC, testified that UPDC is "normally short of staff" which makes it "difficult to enforce the rules such as the introduction of contraband." [doc. #86-1, p. 41]. Additionally, Nicholas Millien, an inmate at UPDC, testified that "[tobacco products] were easy to obtain due to the lack of adequate security personnel." [doc. #86-1, p. 48]. This evidence is sufficient to raise a genuine dispute of material

fact as to whether UPDCC breached its duty by failing to adequately staff UPDC.  Therefore, the Court will proceed to causation.

### 3.  Causation

Plaintiff must next show that UPDCC's alleged failure to adequately staff UPDC caused his exposure to secondhand smoke.  Defendants argue that Louisiana law requires expert medical testimony to prove causation, except where causation is within "common knowledge."  *Id.* According to Defendants, Plaintiff did not produce any expert testimony, and his injuries are not the type where causation is within common knowledge.  *Id.*  Conversely, Plaintiff argues that inadequate staffing is a known cause of contraband in facilities.  [doc. #86, p. 24].  He also argues that the adverse effects of second-hand smoke are common knowledge.  *Id.*

The undersigned agrees with Plaintiff.  As discussed above, the undersigned takes judicial notice of the Surgeon General's 2006 report "The Health Consequences of Involuntary Exposure to Tobacco Smoke," which states that "secondhand smoke is a major cause of disease, including lung cancer and coronary heart disease, in healthy non-smokers" as well as those "with lung and heart disease."  *Sivori v. Epps*, Civ. No. 2:07-cv-79-MTP, 2009 WL 799463, at *7 (S.D. Miss. Mar. 24, 2009) (quoting Surgeon General's 2006 report) (internal quotation marks omitted).  And, the Morrow affidavit affirmatively links the lack of staff to his exposure to second-hand smoke. Therefore, there is a genuine dispute of material fact as to whether UPDCC's failure to ensure UPDC was adequately staffed caused Plaintiff's exposure to secondhand smoke.  Accordingly, the Court will proceed to the remaining elements.

### 4.  Remaining Elements

In a footnote, Defendants argue that Plaintiff cannot show any injury.  [doc. #81-1, p. 22]. Plaintiff, however, alleges he suffered nose bleeds, rise in blood pressure, excessive coughing,

headaches, sleeplessness, chest pain, shortness of breath, and other injuries. [doc. #86, p. 22]. And during discovery, Plaintiff testified that his exposure to marijuana and synthetic marijuana caused "nosebleeds, sneezing . . . [and] excessive coughing." Such evidence is sufficient to raise a genuine dispute of material fact as to whether Plaintiff suffered an injury.

Finally, Defendants do not address the final element—whether the risk of harm was within the scope of protection afforded by the duty breached.

Based on the foregoing, Plaintiff has raised a genuine dispute of material fact for trial, and Defendants are not entitled to summary judgment on his negligence claim.

### G. Plaintiff's negligence claim—that the UPDCC and UPPJ breached their duty to control insects in UPDC—survives.

Next, Defendants seek summary judgment as to Plaintiff's state law negligence claim that UPDCC and UPPJ negligently failed to provide adequate pest services. The Court will consider each element.

#### 1. Duty

As discussed above, UPPJ is not responsible for day-to-day operations at UPDC; therefore, Plaintiff fails to show that UPPJ owed him any duty to control insects at UPDC. Accordingly, the UPPJ is entitled to summary judgment and Plaintiff's negligence claim against it should be dismissed.

Turning to UPDCC, Defendants do not appear to argue that UPDCC did not owe Plaintiff a duty to adequately control pests.[6] [doc. #81-1, p. 28]. Therefore, the Court will proceed to breach.

---

[6] Defendants later acknowledge that the UPDCC is the "keeper of UPDC" and "responsible for the physical maintenance" of UPDC, in accordance with La. R.S. 15:850.4. [doc. #81-1, p. 30].

## 2. *Breach*

Defendants argue that Plaintiff cannot show that UPDCC breached any duty to provide pest control services, because pest control services are regularly provided at UPDC. [doc. #81-1, p. 28]. Defendants offer the affidavit of Paula Strickland, UPDCC and UPPJ Secretary-Treasurer, who states that "regular pest control services were provided at UPDC by D'Arbonne Pest Control between June 2019 and October 2021, the period of Tilmon's incarceration at UPDC." [doc. #81-9, p. 2]. Defendants also attach records of invoices for pest control services at UPDC. [doc. #81-10].

Plaintiff, however, provides summary judgment evidence that UPDC was rife with infestation. Morrow stated in her affidavit that "offenders would get bitten by beg bugs" and that she "observed red bruises from beg bug bites on offenders" which appeared very painful. [doc. #86-1, p. 41]. Inmate Danny Rubin stated in his affidavit that "[UPDC] was infested with insects such as bed bugs." [doc. #86-1, p. 44]. He also stated that he witnessed offenders whose bodies bore "hundreds of bite marks from beg bug bites." *Id.* Furthermore, "the restroom area was infested with gnats that served as a breeding area for the insects as well as cockroaches." *Id.* Likewise, Inmate Nicholas Millien stated that "the living area [at UPDC] was infested with bed bugs, roaches, ants, flies, gnats, and other unknown insects." Thus, Plaintiff provides sufficient evidence to raise a genuine dispute of material fact as to breach, and the Court will proceed to the remaining elements.

## 3. *Remaining Elements*

In cursory fashion, Defendants argue that Plaintiff cannot show injury, causation, or damages. [doc. #81-1, p. 28]. The undersigned disagrees. Plaintiff testified in his deposition that he had an issue with bed bug bites for "six months," and suffered numerous bites on his legs,

hands, and neck.  [doc. #81-3, pp. 152–154].  Thus, Plaintiff raises a fact dispute as to whether he

suffered injuries from insect bites, whether these bites caused his injuries, and whether UPDCC's

failure to adequately control pests caused his exposure to the insects that bit him.

Accordingly, Defendants do not show there are no genuine disputes of material fact.

Therefore, summary judgment should be denied as to this claim.

### H.  Plaintiff's slip-and-fall claim should be dismissed.

Finally, Defendants seek summary judgment as to Plaintiff's slip-and-fall claim.  Plaintiff

claims that he slipped and fell in a puddle of water that collected beneath a faulty water fountain.

[doc. #1, p. 11].

Plaintiff's claim is governed by Louisiana Civil Code Article 2317, which provides: "[w]e

are responsible, not only for the damage occasioned by our own act, but for that which is caused

by the act of persons for whom we are answerable, or of the things which we have in our custody.

This, however, is to be understood with the following modifications."  Louisiana Civil Code

Article 2317.1 provides, in pertinent part:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin,
> vice, or defect, only upon a showing that he knew, or, in the exercise of reasonable
> care, should have known of the ruin, vice, or defect which caused the damage, that
> the damage could have been prevented by the exercise of reasonable care, and that
> he failed to exercise such reasonable care.

La. Civ. Code art. 2317.1.

Louisiana Revised Statute 9:2800 further limits the liability of a public body,

providing, in pertinent part:

> A. A public entity is responsible under Civil Code Article 2317 for damages caused
> by the condition of building within its care and custody
> . . . .
>
> C. Except as provided for in Subsections A and B of this Section, no personal shall
> have a cause of action based solely upon liability imposed under Civil Code Article

> 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
>
> D. Constructive notice shall mean the existence of facts which infer actual knowledge.

La. R.S. 9:2800.

"When a plaintiff seeks damages under La. Civ. Code art. 2317 and La. R.S. 9:2800 . . . the plaintiff bears the burden of establishing that: (1) defendant had custody of the thing that caused the plaintiff's injuries or damages; (2) the thing was defective because it had a condition that created an unreasonable risk of harm; (3) defendant had actual or constructive knowledge of the defect and did not take corrective measurers within a reasonable time; and (4) the defect in the thing was a cause-in-fact of the plaintiff's injuries." *Hunter v. Lafayette Consol. Gov't*, 2015-401, (La. App. 3 Cir. 11/4/15), 177 So. 3d 815, 819–20 (quoting *Davis v. State ex rel. Dep't. of Transp. & Dev.,* 11–625, p. 9 (La. App. 3 Cir. 11/2/11), 78 So.3d 190, 196, *writ denied,* 11–2681 (La. 2/10/12), 80 So.3d 488). "A public entity is deemed to have constructive notice if the defect existed for such a period of time that it should reasonably have discovered it." *Id.* (quoting *Fisher v. Catahoula Parish Police Jury*, 14-1034, p. 4 (La. App. 3 Cir. 4/29/15), 165 So. 3d 321, 324).

Defendants argue that Plaintiff cannot show that Warden Adams, Chairman Gates, or the UPPJ had custody or control of the water fountain. [doc. #81-1, p. 29]. In his opposition, Plaintiff appears to concede this point; he acknowledges that Defendants raise this argument and then proceeds to address only the UPDCC's liability for the slip-and-fall. [doc. #86, p. 26]. Therefore, Plaintiff does not show any genuine dispute of material fact as to whether Warden Adams, Gates, or UPPJ had custody or control of the water fountain. Accordingly, Warden Adams, Chairman Gates, and UPPJ are entitled to summary judgment on this claim.

Turning to UPDCC, Defendants first argue that Plaintiff cannot show that the water fountain was defective. [doc. #81-1, p. 30]. Second, Defendants argue that even if Plaintiff could show the fountain was defective, he cannot show that UPDCC had actual or constructive knowledge of the defect. Third, Defendants argue that even if Plaintiff could establish all the necessary elements of his slip-and-fall claim, it would still fail because the condition was open and obvious. *Id.* at 31.

Defendants cite *Szewczyk v. Party Planners West, Inc.*, 2018-0898 (La. App. 4 Cir. 5/29/19), 274 So. 3d 57, 63, where the plaintiff was injured after falling off a bench at a New Orleans convention center. The plaintiff brought a negligence action, which the trial court dismissed on summary judgment, finding that the plaintiff failed to prove that the bench was defective. *Id.* The appellate court affirmed, noting that plaintiff failed to provide evidence as to who manufactured the bench, whether it was required to be secured to the floor, or any expert testimony supporting his assertion that the bench created an unreasonable risk of harm by not being secured to the floor. *Id.* at 63.

Defendants argue that, like the plaintiff in *Szewczyk*, Plaintiff here has no evidence showing that the water fountain was defective, and, therefore, his slip-and-fall claim fails. [doc. #81-1, pp. 30–31]. However, Plaintiff does provide summary judgment evidence that the water fountain was defective; Rubin stated in his affidavit that "there was a broken water fountain" in "M" dormitory, and that "water would always collect under and around the fountain." [doc. #86-1, pp. 44–45]. Additionally, Millien stated in his affidavit that the water fountain in "M" dormitory "was covered with a plastic trash bag due to it malfunctioning." [doc. #86-1, p. 48]. Plaintiff also testified that the fountain was known to be defective. [doc. #81-3, p. 176]. Unlike *Szewczyk*, where expert testimony was necessary to establish whether a bench needed to be bolted to the floor to avoid

posing a hazard, it seems a matter of common sense that a leaky water fountain is defective. Thus, what remains is a fact dispute as to whether the water fountain was leaking water; Defendants say that it was not, Plaintiff says that it was.

As to UPDCC's knowledge of the defect, Defendants point to the Declarations of Warden Adams and Strickland, which each state that UPDCC had no knowledge of any problems or defects with the water fountain. However, Plaintiff testified in his deposition that inmates had warned UPDC maintenance for "over a year that that water fountain [sic] needed repairing." [doc. #81-3, p. 176]. He also offers Rubin's affidavit, which states that Warden Adams was "told about the fountain," but "no one ever tried fixing it as long as [Rubin] liv[ed] in ["M" Dormitory]. *Id.* Thus, Plaintiff has raised a fact dispute as to whether UPDCC was aware of the that the fountain was defective.

Third, Defendants argue that even if Plaintiff satisfies each element of his slip-and-fall claim, the condition was open and obvious, and, therefore, his claim fails. [doc. #81-1, p. 31]. In support of their argument, Defendants point to Plaintiff's testimony that the puddle of water was four-to-five feet wide and his admission that he knew the water was there. *Id.*

Whether a condition is open and obvious is not a jurisprudential doctrine barring recovery; it is "embraced within the breach of the duty element of the duty/risk analysis." *Farrell v. Circle K Stores, Inc.*, 22-0849 (La. 3/17/23), 359 So. 3d 467, 478. "For a hazard to be considered open and obvious, it must be one that is open and obvious to all who may encounter it. The open and obvious concept asks whether the complained of condition would be apparent to *any* reasonable person who might encounter it." *Id.* (emphasis added).

Plaintiff testified that he was aware of the puddle of water, and he submitted summary judgment evidence that other inmates were aware of it as well; affiant Nicholas Millien stated that

the water fountain was "covered in a plastic trash bag" because it malfunctioned.  [doc. #86-1, p. 48].  There also appears to be no factual dispute as to the size of the pool of water; Plaintiff testified that it was "four or five feet in circumference."  [doc. #81-3, p. 181].

As previously noted, there is no jury demand in this case; thus, the Court has some limited discretion to decide that this same evidence, presented to the undersigned as trier of fact could not possibly lead to a different result.  *Jones*, 936 F.3d at 321.  And as discussed above, the undersigned magistrate judge is ordinarily the trier of fact in a non-jury, pro se prisoner complaint.[7]  *See McAfee*, 63 F.3d at 437 (*Flowers* hearing "amounts to a bench trial replete with credibility determinations and findings of fact.").

Exercising that discretion here, the undersigned concludes that the pool of water was of such a size that any reasonable person who encountered it would know to avoid it.  *See Farrell*, 359 So.3d at 478.  Furthermore, Plaintiff himself was well aware of the puddle of water and knew to avoid it when rounding the corner.  [doc. #86-1, pp. 175–180].  Therefore, the undersigned finds that the puddle of water was an open and obvious condition.

Accordingly, UPDCC is entitled to summary judgment, and this claim should be dismissed.

III.    *Plaintiff's Motion for Copies*

On June 1, 2023, Plaintiff filed a "motion for copies" wherein he requests leave to conduct additional discovery, including leave to obtain additional declarations from various individuals.  [doc. #94, p. 2].  Plaintiff, however, provides no persuasive reasoning as to why he was unable to

---

[7] If this Report & Recommendation is adopted, no federal law claims will remain.  However, there appears to be no case law restricting the undersigned from conducting a *Flowers* hearing over the remaining state law claims.  In fact, in *Flowers v. Phelps*, the magistrate judge tried both federal law claims and Louisiana state law claims.  *Flowers*, 956 F.2d at 490 ("Flowers' claims under the Eighth Amendment and Louisiana law for excessive use of force were tried to a magistrate judge over a two-day period).

obtain declarations from these individuals during the discovery period.    Therefore, Plaintiff's

motion is DENIED.    The undersigned would note that, were this case to proceed to trial, Plaintiff

would have the opportunity to call witnesses, subject to the relevant rules of evidence.

<u>Conclusion</u>

For the foregoing reasons,

**IT IS RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED**

**IN PART** and **DENIED IN PART**.    Defendants' motion should granted and Plaintiff's claims

dismissed as to the following claims: (1) that Defendants exposed Plaintiff to excessive e-cigarette,

tobacco, and marijuana smoke in violation of the Eighth Amendment; (2) that Defendants failure

to adequately staff UPDC caused Plaintiff's exposure to marijuana smoke which prevented him

from practicing his religion; (3) that Defendants failure to adequately staff UPDC violated

RLUIPA; (4) that the conditions of Plaintiff's confinement violated his Eighth Amendment rights;

(5) Plaintiff's retaliation claim; (6) Plaintiff's state-law negligence claims only as to UPPJ; and (7)

Plaintiff's slip-and-fall claim.

**IT IS FURTHER RECOMMENDED** Defendants motion should otherwise be denied.[8]

**IT IS ORDERED** that Plaintiff's motion for copies [doc. #94], is **DENIED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties

have **fourteen (14)** days from service of this Report and Recommendation to file specific, written

objections with the Clerk of Court.    A party may respond to another party's objections within

**fourteen (14) days** after being served with a copy thereof.    A courtesy copy of any objection or

---

[8] Two claims remain, both against UPDCC: (1) state-law negligence for exposure to environmental tobacco smoke and (2) state-law negligence for failure to control insects.

response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 17th day of July, 2023.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE